The **O'DAY CORPORATION**, Plaintiff, Appellant,

v.

**TALMAN CORPORATION** et al., Defendants, Appellees.

No. 6034.

United States Court of Appeals First Circuit.

Dec. 6, 1962.

Robert B. Russell, Boston, Mass., with whom Benjamin A. Smith, Providence, R. I., Russell, Chittick & Pfund, Boston, Mass., and Tillinghast, Collins & Tanner, Providence, R. I., were on brief, for appellant.

Edward F. Hindle, Providence, R. I., with whom John H. Chafee and Edwards & Angell, Providence, R. I., were on brief, for appellees.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

This is an action for unfair competition in which the court found for the defendants. We believe the court was essentially correct, both in its careful findings and in its reasons, but because we think it quite possibly erred in excluding certain letters [1] we will review the record not on the usual basis of whether appellant has shown the court to have been plainly wrong, but whether it has a case even on its own view of the evidence.

Appellant, The O'Day Corporation a Massachusetts corporation, hereinafter O'Day, connoting either the company or its principal officer, George O'Day, is engaged in the manufacture of various stock (as distinguished from custom-built) fiberglass boats. The one here in question, known as the Day Sailer, is a 16′ 10″ sailboat with a large open cockpit, a cuddy, or small cabin, and a short afterdeck. In appearance its most noteworthy characteristics are a high boom, a wide, flat hull, and an overall stubby look. In performance its chief characteristics are substantial planing ability, namely, ability to come out on top of the water at high speeds, combined with ease of handling and carrying capacity. This resulted, to a marked degree, in both a racing and a family boat. Although there were a number of other planing sailboats on the market it could be found that O'Day achieved the maximum versatility and for such was rewarded with outstanding commercial success. No patent, copyright or trademark is involved.[2]

The most important feature of a planing boat is the underwater hull. O'Day's was designed by the leading specialist in the sailing field, an Englishman named Fox. Fox designed the above-water portions as well, and made a number of alternative suggestions, not all of which were followed. Fox's letters in O'Day's files, containing these suggestions, were excluded by the court.

Production of the Day Sailer was begun in the summer of 1958. In February, 1959 O'Day engaged appellee Talman Bigelow, now the principal officer of the corporate defendant-appellee, Talman Corporation, as sales manager. Both Bigelow and his company are of the state of New York, although the latter's place of business is Rhode Island. Bigelow was discharged in October, 1959. Before he left, on uncontradicted evidence he contemplated engaging in a competitive line. Commencing in the spring of 1960, after forming his own company, and using the hull of a Day Sailer as his principal guide,[3] he embarked in the

---

1. We might also observe that one of appellees' witnesses, a naval architect, gave positive expert opinions that even his own testimony showed to be unwarranted. It does not appear, however, that the court relied in any way on his evidence. Nor do we.

2. There is a claim under the Lanham Act, 15 U.S.C. § 1125(a), but we do not find this calls for separate discussion.

3. Reproduction of a wooden hull requires "taking off" lines, and is said to be a technical and difficult matter. Fiberglass hulls are built up, using molds, and if one already has the hull a duplicate mold is easily accomplished.

manufacture and sale of the Explorer, a 17 foot planing sailboat substantially similar in many respects to the Day Sailer. There can be no question but that O'Day has been seriously damaged by appellees' activities. Whether it has a right of action is another matter.

On analysis, O'Day's position is ambivalent. It complains both because Bigelow has copied the Sailer, and because he has not. We will first list the changes. There was a slight alteration in the silhouette line of the stem, or bow; the bow was also raised ¾ of an inch, and the stern 2 inches, increasing the sheer, or curve of the deck; the length of the hull was increased 2 inches; the sail area was increased by 4 square feet. None of these changes had any appreciable consequences, even in the overall appearance. The Explorer, except for the markings on the sail and a small nameplate on the bow, is indistinguishable from the Day Sailer at any distance, even to initiates. In addition, the centerboard was lengthened to 5 feet, its location was moved 2 inches, and it was made adjustable in four positions; a change was made in the rudder; certain fittings (hardware) were changed or added; the flotation tanks were altered and were styrofoam filled; the outside fender, or rub-rail, was lowered to a stronger position; the cockpit coaming, or inner deck-rail, was made narrower, and the deck was given a non-skid surface. Further, a floor was added, making the cockpit self-bailing and more comfortable, and increasing the rigidity of the hull. Finally, the angle of the transom, or stern, was changed and a hole was cut in the afterdeck to accommodate large American outboards without the necessity of a bracket, and the hull itself was made a little fuller aft to provide greater buoyancy.

It is clear that some of these changes added to the attractiveness of the boat.[4] On the other hand, no alteration of any consequence was made in the planing characteristics of the hull. This, obviously, was the single most important feature, and was obtained at the cost of buying one Day Sailer to copy from, while O'Day is under a continuing obligation to pay royalties to Fox.

Unpleasant as it may be for O'Day, we see no legal merit in its charge of outright copying. The hulls are plainly marked, appellees' selling literature is distinctive, there is no claim of being a Fox design and the different manufacturer is fully disclosed. No buyer could be confused as to source. Swank, Inc. v. Anson, Inc., 1 Cir., 1952, 196 F.2d 330; Reynolds & Reynolds Co. v. Norick, 10 Cir., 1940, 114 F.2d 278. Indeed, O'Day does not really contend otherwise. It talks broadly about "reputation poaching." However, there is no evidence that its product, through appearance or performance, has acquired such a reputation or secondary meaning that customers may be deceived as to Explorer's source in spite of its markings. Cf. Kellogg Co. v. National Biscuit Co., 1938, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73; Crescent Tool Co. v. Kilborn & Bishop Co., 2 Cir., 1917, 247 F. 299. Similarly, while casual spectators may in fact be unable to distinguish between a Day Sailer and an Explorer, there is no evidence that purchasers of the latter trade on this fact in order to obtain intangible benefits from the reputation of the former. Cf. Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-Le Coulture Watches, Inc., 2 Cir., 1955, 221 F.2d 464, cert. den. 350 U.S. 832, 76 S.Ct. 67, 100 L.Ed. 743. To the extent that O'Day has a reputation apart from its boat, it has not been "poached." This case seems to us a clear illustration of the general rule that there can be no infringement of a non-patentable and non-copyrightable design. "Unfair competition" requires something affirmative; it does not automatically pick up what these other recognized rights omit. Kellogg Co. v. National Biscuit Co., supra; Charles D.

---

4. Bigelow testified, for example, that his first model had no self-bailing cockpit, and that some of these were still unsold even though he offered a $260 reduction. The Day Sailer and Explorer both retail at about $1900.

Briddell, Inc. v. Alglobe Trading Corp., 2 Cir., 1952, 194 F.2d 416; Cheney Bros. v. Doris Silk Corp., 2 Cir., 1929, 35 F.2d 279, cert. den. 281 U.S. 728, 50 S.Ct. 245, 74 L.Ed. 1145. Even if the law of New York governs part of this case, as O'Day contends, we regard its case of Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., 1950, 199 Misc. 786, 101 N.Y.S.2d 483, aff'd 279 App.Div. 632, 107 N.Y.S.2d 795, as, at most, but a limited departure from these general principles, inapplicable to the facts at bar.

■■ Conversely, O'Day cannot complain of the changes made by Bigelow without some special reason. It invokes as its ground a confidential relationship, a principle the court fully recognized, but held inapplicable. Bigelow learned during the course of his employment through customer complaints, his own personal observations from sailing a Day Sailer, talk in the trade, and possibly talk in the shop, of various "bugs" in the Sailer that needed correction, and of various improvements that might be made. It is conceivable that some of these matters, apart from the Fox letters to be separately discussed, came to him in such confidence under all the circumstances that the law would protect them. However, it is quite impossible on the record to tell which, if any, these were. There is obviously no presumption that everything Bigelow learned during the course of his employment was of a confidential character. Manton-Gaulin Manufacturing Co. v. Colony, 1926, 255 Mass. 194, 151 N.E. 71, 44 A.L.R. 589; American Stay Co. v. Delaney, 1912, 211 Mass. 229, 97 N.E. 911. O'Day has not met its burden of proof. Cf. American Win-

dow Cleaning Co. v. Cohen, 343 Mass. 195, 178 N.E.2d 5. If it was apprehensive of Bigelow's learning unidentifiable confidences, this is a classic case where it should have obtained an agreement not to compete.

The Fox letters must be separately considered. These letters were in files within Bigelow's reach, but concerned matters not within his duties. While he denied seeing them, in view of his evident proclivities [5] it would be quite reasonable to assume that he saw them, given only a small amount of evidence to support the inference. We find such evidence in the similarity of certain changes he made. Accordingly, we think the court should not have excluded the letters, but should have admitted them and then considered the consequences.[6]

O'Day points to five matters contained in the letters which it says by more than coincidence were reflected in the Explorer. 1. That the hull was well suited for American high-powered outboards. This statement was something less than true. Because of the angle of the stern no such outboard could be mounted except with a bracket, and brackets are a poor device for heavy motors. In order to make the hull truly suitable for large motors Bigelow had to redesign the stern. 2. That it would be desirable to omit the afterdeck to reduce weight, to facilitate boarding, to give more room in the cockpit, and to make it possible to hang the outboard motor directly on the transom. Bigelow did not omit the entire afterdeck, but omitted a small portion to accommodate an outboard, a different and much more original concept. 3. To install a cockpit floor at the load water-

5. Bigelow did other things, such as using a photograph of a disguised Day Sailer in his original advertising, and suggesting he was in a well-established business before he was even started, which reflect his willingness to "borrow" from others. He made no pretense, however, even with respect to this picture, that he was selling Day Sailers, and we cannot see that these activities occasioned legal harm to O'Day.

6. In fairness to the court, it is quite understandable that it made a contrary ruling.

The letters were originally offered during O'Day's case in chief. The reasons given for their admission at that time were wholly insufficient to meet objections based upon hearsay. Later, during rebuttal, O'Day re-offered them in part. While, on the printed record, the new ground is sufficiently plain to us, we think counsel was something less than fully explicit, and permitted the court to believe it was still passing on the grounds of admissibility raised before.

line (i. e., at a level corresponding with the level of the water outside the boat) in order to increase the rigidity of the hull, and for comfort. Bigelow did install a floor, but he placed it above the waterline and provided drainage, thus making the cockpit "self-bailing." 4. To raise the freeboard, or overall height of the hull, one or two inches. Bigelow raised it two inches aft, ¾ of an inch at the bow, and not at all amidships. 5. To lengthen the centerboard to five feet. Bigelow did this exactly.

On analysis it does not seem to us that Bigelow made any substantial use, beyond what would have been within general knowledge, of the first three items. Outboard motors are common. So are floors. All that may be directly traced to the letters are the increased freeboard and the five foot centerboard. O'Day has not shown any direct financial benefit accruing to appellees because of these specific changes. Cf. American Stay Co. v. Delaney, supra. From the standpoint of simply equitable relief, the question must be has there been any harm to O'Day.

■■ This case presents a somewhat unusual situation. The Day Sailer has become established as a "class" boat, and O'Day's largest market is to persons desiring to participate in class activities, notably racing. This means maintaining the identity of the hull and of many other features, as the evidence is clear that even minor changes which would affect performance cannot be made without causing disqualification from the class. Consequently, O'Day was "locked in," and could not change the freeboard or centerboard even if it would be an improvement. It may be that because of Fox's disclosures Bigelow obtained a better hull, to O'Day's disadvantage, by making changes the possibility of which would otherwise have remained secret. But it may also be that Bigelow's hull was not in fact any better, or alternatively, that anyone with ordinary skills, after watching the Day Sailer perform, would have thought to make these changes unaided. Again, on these matters

O'Day offered no evidence, and made no offer of proof. Before affording equitable relief for breach of confidence the court should be satisfied that there was affirmative injury, and that the injury directly resulted from the breach. Very possibly this was a difficult burden to meet, but this cannot excuse its performance.

Judgment will be entered affirming the judgment of the District Court.