**COLGATE–PALMOLIVE COMPANY,**
Petitioner,
v.
**FEDERAL TRADE COMMISSION,**
Respondent.

**TED BATES & COMPANY, Inc.,**
Petitioner,
v.
**FEDERAL TRADE COMMISSION.**
Respondent.
Nos. 6145, 6146.

United States Court of Appeals
First Circuit.
Dec. 17, 1963.

---

518

Mathias F. Correa, New York City, with whom Arthur Mermin, New York City, John F. Groden, Boston, Mass., Cahill, Gordon, Reindel & Ohl, New York City, and Withington, Cross, Park & McCann, Boston, Mass., were on the brief, for Colgate-Palmolive Co.

Joseph A. McManus, New York City, with whom Lane McGovern, Boston, Mass., H. Thomas Austern, Alvin Friedman, Washington, D. C., David Falk, Washington, D. C., Coudert Brothers, New York City, Ropes & Gray, Boston, Mass., and Covington & Burling, Washington, D. C., were on the brief, for Ted Bates & Co., Inc.

Philip B. Heyman, Atty., Dept. of Justice, with whom James McI. Henderson, Gen. Counsel, J. B. Truly, Asst. Gen. Counsel, and Miles J. Brown, Attorney, Federal Trade Commission, were on the brief, for respondent.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

In 1959 petitioner Colgate-Palmolive Company, at the suggestion of its advertising agency, petitioner Ted Bates & Company, ran a series of television commercials purporting to show, by moving pictures and dialogue, that Colgate's shaving cream Palmolive Rapid Shave was so "moisturizing" that it would permit "tough" (coarse) sandpaper to be "shaved" immediately with a safety razor. The Federal Trade Commission, after a hearing, found that the seeming sandpaper which had been photographed as being shaved in the studio was a plexiglass "mock-up"; that even fine sandpaper could not be shaved immediately; and that coarse paper could not be shaved until "moisturized" for an hour. There being a clear misrepresentation, the Commission entered orders forbidding the continuation of such, or similar, advertising. In addition it forbad, except for purely background purposes, all

further undisclosed use of mock-ups.[1] Petitioners, respondents in the proceedings below and hereafter so termed, had made the point that technical problems and imperfections in the photographic process sometimes required the use of mock-ups in order to effect entirely correct reproductions on the screen.[2] The Commission held this to be irrelevant even though no quality, attribute, appearance of, or feat which could be performed by, the product was inaccurately represented. On a petition for review, over respondents' opposition which we found conspicuously unmeritorious, we agreed with the Commission that there had been a material misrepresentation of the cream's ability to shave sandpaper, and thus improper advertising. However, we agreed with respondents on the second aspect, and returned the case to the Commission for the formulation of a new order in accordance with our opinion. 310 F.2d at 95. Contending that the new order failed to comply with our expressed views, respondents are back with new petitions.

Prior to the issuance of its new order in final form the Commission handed down a fifteen-page opinion,[3] hereinafter the "second opinion," in which it recited that our "various suggestions" "in substantial part have been accepted." We reached a number of conclusions not labelled suggestions which the Commission was not free to disregard under the mandate. 15 U.S.C.A. § 45(i); see Virginia Lincoln Furniture Corp. v. Commissioner, 4 Cir., 1933, 67 F.2d 8 (comparable provision under the revenue acts); cf. Morand Bros. Beverage Co. v. N. L. R. B., 7 Cir., 1953, 204 F.2d 529, 532, cert. den. 346 U.S. 909, 74 S.Ct. 241, 98 L.Ed. 407. Respondents assert that it has done so in substantial measure.[4] But because much importance beyond this particular case has become attached to the Commission's antipathy to mock-ups, we will make an exception and re-examine its present [5] position on the merits rather than from the limited standpoint of whether it comports with our previous opinion.

1. For the broad scope of this order, applying to all "pictures, depictions, or demonstrations * * * not in fact genuine * * *," see our former opinion in this case, reported at 310 F.2d 89 (1962), and Judge Wisdom's discussion thereof in Carter Products, Inc. v. F. T. C., 5 Cir., 1963, 323 F.2d 523.

2. It is recognized for example, that the brown color of iced tea disappears, so that it looks like water. Blue shirts must be worn to simulate natural white. The sand on sandpaper, it was found in this case, fails to reproduce, leaving an apparently plain surface. Some substances which may photograph correctly, such as ice cream or frosting, or the head on beer, melt under the hot lights. In other cases so many retakes may be required that even the actor might fade with repeated consumption of the advertised product. For these and similar reasons, physical properties must sometimes be "made up" or entirely replaced by "mock-ups" although the result is a faithful and accurate portrayal.

3. We mention the length of this opinion lest it be thought that the ambiguities we are about to discuss were due to cursory or ill-considered expression by the Commission. In fact the Commission wrote still a third opinion when it put its present order in final form, and after respondents had asserted difficulties in interpretation. In this third opinion it said that it had now acted to "restate with clarity and precision the basis and breadth of our findings and order."

4. See also, e. g., Note, The Rapid Shave Case, 38 Notre Dame Law. 350, 354 (1963), "The Commission has not capitulated, but has merely withdrawn to regroup its forces." The Commission's response is that if it has departed from our opinion it is because we misunderstood its original intention, due in large measure to "extreme arguments" made by its counsel. Because of this we asked present counsel whether he had cleared his argument with the Commission, and received an affirmative reply. The importance of this will shortly become apparent.

5. There is so much in the Commission's second and third opinion about our having misunderstood its original position that we are not sure whether we now have before us a new position, or merely its old one "restated." See fn. 3, supra.

The substance of the present order is contained in the following passage. Respondents are to cease and desist from,

"Unfairly or deceptively advertising any such product by presenting a test, experiment or demonstration that (1) is represented to the public as actual proof of a claim made for the product which is material to inducing its sale, and (2) is not in fact a genuine test, experiment or demonstration being conducted as represented and does not in fact constitute actual proof of the claim, because of the undisclosed use and substitution of a mock-up or prop instead of the product, article, or substance represented to be used therein."

If, to ascertain what is meant by "demonstration" and "actual proof" of a material claim, one turns to the second opinion, one learns that a "demonstration" is something which "prove[s] visually a quality claimed" for a product as distinguished from a "casual or incidental display" which is "not presented as proof of the * * * [quality] or appearance of the * * * [product], and thus in no practical sense would have a material effect in inducing sales * * *." [6] In the view of the Commission this language "resolved" any "ambiguity." In the balance of its opinion, directed to the scope of the order, the Commission discussed examples of admittedly material misrepresentation, such as improper disparagement of a competitor, dishonest testimonials, misrepresentation of the seller's trade status, or of its receipt of an award or of prominent patronage, and concluded with the following footnote,

"* * * The misrepresentation would not have been greater or more material, but only more explicit, if the announcer had stated: 'this test is being made on real sandpaper, and not an artificial mock-up contrived to look like sandpaper.' The point is, whatever the technical photographic reasons justifying use of a mock-up, there could be no justification for the false presentation to the public of 'proof' that in fact was not proof."

At the oral argument, to test whether there was no ambiguity, we asked counsel for the Commission if an ice cream manufacturer showed an enlarged and appealing photograph of what was apparently rich, creamy ice cream which coincided exactly in appearance with its product, but was in fact a mock-up (see fn. 2, supra), it was not an attempt "to prove visually the quality * * * or appearance of the product" that might have a "material effect in inducing sales," and hence deceptive advertising. He replied this would be unobjectionable because "demonstration" in the Commission's order was to be read by the rule of *ejusdem generis*, and meant demonstration "in the nature of a test or experiment." [7] He added that a buyer would be "morally disillusioned" if he learned that he had witnessed a phony test, but that a buyer of the ice cream would be indifferent to the use of the mock-up.[8] The important difference, the Commission asserts, is that in the case of a test, as distinguished from a display or illustration, the viewer believes he has seen "proof" which transcends the advertiser's "word." [9]

While, as we said in our previous opinion, every undisclosed use of mock-up or

6. The Commission rephrases this in its brief as the difference between a mock-up which "displays or illustrates a claim," and one that purportedly "objectively" "proves its truthfulness." As will be developed, we find this less than a clarification of what the Commission states (fn. 3, supra) was already "precise."

7. See fn. 4, supra. The ice cream matter was dealt with less specifically in the second opinion, the Commission saying that such an illustration was proper if "incidental."

8. In other words, to have seen simulated sandpaper wetted by shaving cream is less palatable then to have one's appetite whetted by emulsified cold cream.

9. The Commission also claims that its toleration of such deception would be unfair to competitors. This would seem in

make-up involves a "misrepresentation of a sort," we must consider the consequences of the Commission's order. In spite of the Commission's belief that it has resolved all ambiguities, we envisage great difficulty in determining any dividing line between what is and what is not a test or experiment, or in defining what is a demonstration in the nature of such. Primarily this may be because we find no substantial logical difference between what the Commission disapproves of and what it accepts. We do not see, for instance, why any pictorial representation of delicious-seeming ice cream is not intended to "prove visually the quality * * * or appearance" of the product. Or, to turn to the Commission's footnote, that the exhibitor does not impliedly say, "This is our ice cream," just as much as the implied announcement, "This is real sandpaper," is attributed to Colgate.

The issue of implication goes deeper. If a manufacturer exhibits a bed sheet, in fact blue, but apparently white, in connection with advertising its soap, is this depiction something which merely "displays or illustrates a claim," and therefore benign,[10] or does it (improperly) imply there has been a test? Even if it does imply a test, is this permissible since because this was not "verified or proved by an experiment performed before the eyes of the viewer" (Commission's brief) he cannot believe he has seen "proof" independent of the advertiser's "word?"[11] If the mere exhibition of the doctored sheet is not forbidden (provided the total effect is correct),

would it become a "demonstration in the nature of a test" if the sheet were shown being taken out of a washing machine? Again, if an adult may be pictured apparently enjoying allegedly delicious medicine (the Commission accepts fully the "I love Lipsom's" hypothetical in our earlier opinion, 310 F.2d at 93, n. 7) does it become a test or a demonstration in the nature of a test if the supposed patient is so young that it may be thought that the smile of enjoyment was a spontaneous reaction? And if so, how young? Such questions, and others like them, may be readily put, not as the product of a fertile imagination, but as the result of ephemeral examination of current TV commercials.

The existence of such difficulties can only bring to mind the principle that an order must be capable of practical interpretation. F. T. C. v. Henry Broch & Co., 1962, 368 U.S. 360, 368, 82 S.Ct. 431, 7 L.Ed.2d 353.[12] The relative insignificance of the issue before us makes it particularly unwarranted to offend this principle. By hypothesis we are not talking about misrepresentation of any quality or appearance of the product, or whether it can or cannot perform the "test" which it is claimed to accomplish. We are considering no basic deception, but only the situation where, in illustrating faithfully a test which has been actually performed, an advertiser uses some foreign mock-up or make-up. As we stated in our previous opinion, so far as deceit is concerned the buyer is interested in what he thinks he sees, and

---

this context a mere restatement of the Commission's position rather than additional argument.

10. See fn. 6, supra.

11. In its first opinion the Commission said, "[A]n announcer may wear a blue shirt that photographs white; but he may not advertise a soap or detergent's 'whitening' qualities by pointing to the 'whiteness' of his blue shirt. The difference in all these cases is the time-honored distinction between a misstatement of truth that is material to the inducement of a sale and one that is not." We would hazard no guess as to the extent, if any,

the Commission has now departed from this position.

12. While there is much meat in Jaffe, The Judicial Enforcement of Administrative Orders, 76 Harv.L.Rev. 865 (1963), we suspect that respondents would find little nourishment in the author's thesis that the courts may be counted on to neutralize, at the stage of adjudicating violation or imposing penalty, excesses by administrative bodies. Nor does the Commission's suggestion of advisory administrative opinions seem a ready solution. We think the very suggestion indicates the Commission's failure to realize the scope of the problem.

if what he buys can do and has done exactly what he thinks he sees it do, he has not been misled to any substantial degree.[13]

In seeking to stress the extent of misrepresentation by mock-up the Commission sometimes loses sight of the difference between a mock-up which presents an accurate portrayal and one, like Colgate's, that effects a basic deception, and at other times, in speaking of the buyer's "disillusionment," proceeds as if he would learn of the mock-up, but would not learn that no quality or characteristic of the product had been misrepresented.[14] Nor are we impressed with the strength of the previously mentioned difference that in a "genuine" test the viewer has more "proof" than the advertiser's "word." Even here there is usually a significant dependence upon the advertiser's word. We may take judicial notice that commercials are normally prerecorded. We may also assume, although the matter is not adverted to by the Commission, that the exhibition of a test implies that it can always be carried out, and not that this was the rare exception. The Commission has never opposed prerecordings, nor do we think it should, yet on this vital implication there is only the advertiser's word. We see little difference between this and taking his word that the test depicted is a faithful reproduction in other respects.

The Commission's real objection, of course, is not to the resort to a mock-up, but to the implied representation that none is employed. This is apparent not only from the cases it regards apposite, which involved positive affirmations, such as that the manufacturer had (contrary to fact) received an award, or testimonials, or orders from certain customers, but also specifically from its conclusion that respondents' advertisement would be no worse, "only more explicit," if the announcer had affirmatively stated, "This is real sandpaper." The nub of this case, to return to our ice cream comparison, is either that Colgate impliedly says its depiction is real and the ice cream manufacturer does not, or that the misrepresentation is material in the case of the sandpaper, and harmless in the case of the ice cream. The Commission says the ice cream case is different, but, with all deference, we find its opinion, while long on generalities, short on analysis. It would seem paradoxical to say that a misrepresentation that what is shown is the actual product is harmless while a misrepresentation as to something else is not. Yet we cannot see why if the representation is to be implied in one instance it is not in the other.

Under all the circumstances, we see only one practical solution. It is to hold that, in the absence of any express statement,[15] the only implied representation

13. In O'Day Corp. v. Talman Corp., 1962, 310 F.2d 623, 626, n. 5, cert. den. 372 U.S. 977, 83 S.Ct. 1112, 10 L.Ed.2d 142, we held that it was not unfair competition, where defendant sold, and could properly sell, a sailboat substantially identical to plaintiff's, for defendant to use in its advertisements a picture which in fact was of plaintiff's boat instead of its own. While in that instance the boat was not "performing," we do not think the result would have been different if she had been photographed under sail if their performance was the same.

14. We pointed out in our previous opinons there was a difference between claiming that one had received a certain testimonial when one had not, and merely reproducing (without disclosure) a copy of an actual testimonial because the original would not "photograph." The second opinion continues to talk only about the former.

15. Contrary to the Commission, we believe it may, within limits, be more serious for the advertiser to misstate affirmatively the details of what is being shown than to imply them. The very fact of affirmation, as well as indicating an actual intent, dignifies the representation. Cf. NLRB v. Trancoa Chemical Corp., 1 Cir., 1962, 303 F.2d 456, 461. We would doubt, for instance, that if a manufacturer stated, "This is an actual unretouched photograph of our ice cream," the Commission would regard it as immaterial that the subject was a mock-up.

---

is that no basic dishonesty has been introduced into the picture by the photographic process. Such a principle would, we think, be of universal application, and would include all demonstrations whether in the nature of a test or otherwise. It would cover the situations we found troublesome in our previous opinion which the Commission has failed to discuss,[16] and every case of mock-up or make-up purporting to reproduce on the screen an exact representation of the qualities and appearance of the product, or, in the case of a claim of performance, of an actual test. If there is an accurate portrayal of the product's attributes or performance, there is no deceit. Such a principle may not be meticulously perfect, but we believe it would lead to minimum uncertainty and go more nearly to the heart of the matter.[17] It would also avoid the inroads into the commercial's sixty seconds which would result from having to make the statement whenever mock-ups were used that the exhibition, though employing artificial aids, was a faithful portrayal of actual events, together with such other rehabilitating data as might be thought necessary to make the showing persuasive. While we do not make this the basis of our decision, we reiterate our former observation that an enforced remedy should not outdistance the need.

The principle we espouse has no special relationship to mock-ups, and to amend the present order along such lines would serve no particular purpose. Accordingly, we instruct the Commission, as we thought we had directed it before, to enter an order confined to the facts of this case, where respondents used a mock-up to demonstrate something which in fact could not be accomplished. However, as to what terms the new order should contain with respect to products and customers, we did not, as the respondents seem to feel, direct the Commission to enter the narrowest possible order. There is more than one way to deal with a "single offense," cf. All-Luminum Products, Inc., FTC 11/7/63, particularly a blatant one. We do agree with respondents that the Commission has been concerned with its broad opposition to mock-ups and has never expressed its views with respect to the proper scope of an order directed to more narrowly conceived substantive misconduct. In this situation we continue to believe that we should not comment on the precise terms of an order *in vacuo*. We will add, however, in view of the strenuous opposition expressed by respondent Ted Bates & Company to the so-called "imposition of a burden" of showing extenuation,[18] that respondent has misconceived the principle. The Commission has allowed it an escape, rather than imposed a burden. We see no reason why advertising agencies, which are now big business, should be able to shirk from at least prima facie

16. E. g., a "genuine" demonstration in which the normal photographic process actually upgrades the product. See, also, fn. 14, supra.

17. The Commission makes the point that such permissive use of mock-ups would greatly increase its policing difficulties. The Commission clearly has such duties, and considering the substantial manner in which respondents' mock-up departed from the truth and their insistence even in this court that there had been no misrepresentation, (see, also Carter Products Inc. v. F.T.C., supra) we are sympathetic. There are, however, other solutions. For instance, there might be no objection to a properly formulated rule

placing the burden of going forward (we do not mean burden of proof, cf. United Aniline Co. v. Commissioner, 1 Cir., 1963, 316 F.2d 701) upon a party who uses a mock-up or make-up to show that no basic deception, as we have been using the term, was accomplished thereby. This burden might be particularly heavy if there was no "photographic" reason for employing a substitute.

18. The same order was entered against Bates as against Colgate, but with respect to Bates there was a proviso that lack of knowledge, or of reason to know, of the existence of a mock-up would be a defense.

responsibility for conduct in which they participate.

Judgment will be entered setting aside the order of the Commission. Further proceedings to be in accordance with this opinion.