# FEDERAL TRADE COMMISSION *v.* COLGATE-PALMOLIVE CO. ET AL.

No. 62. Argued December 10, 1964.—Decided April 5, 1965.

*Philip B. Heymann* argued the cause for petitioner. With him on the briefs were *Solicitor General Cox, Assistant Attorney General Orrick* and *James McI. Henderson.*

*John F. Sonnett* argued the cause for respondents. With him on the brief for Colgate-Palmolive Co. was *Arthur Mermin.* On the brief for Ted Bates & Co., Inc., were *H. Thomas Austern* and *William H. Allen.*

Briefs of *amici curiae,* urging affirmance, were filed by *Mahlon F. Perkins, Jr.,* for the American Association of Advertising Agencies, Inc., and by *Gilbert H. Weil* for the Association of National Advertisers, Inc.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

The basic question before us is whether it is a deceptive trade practice, prohibited by § 5 of the Federal Trade

Commission Act,[1] to represent falsely that a televised test, experiment, or demonstration provides a viewer with visual proof of a product claim, regardless of whether the product claim is itself true.

The case arises out of an attempt by respondent Colgate-Palmolive Company to prove to the television public that its shaving cream, "Rapid Shave," outshaves them all. Respondent Ted Bates & Company, Inc., an advertising agency, prepared for Colgate three one-minute commercials designed to show that Rapid Shave could soften even the toughness of sandpaper. Each of the commercials contained the same "sandpaper test." The announcer informed the audience that, "To prove RAPID SHAVE's super-moisturizing power, we put it right from the can onto this tough, dry sandpaper. It was apply . . . soak . . . and off in a stroke." While the announcer was speaking, Rapid Shave was applied to a substance that appeared to be sandpaper, and immediately thereafter a razor was shown shaving the substance clean.

The Federal Trade Commission issued a complaint against respondents Colgate and Bates charging that the commercials were false and deceptive. The evidence before the hearing examiner disclosed that sandpaper of the type depicted in the commercials could not be shaved immediately following the application of Rapid Shave, but required a substantial soaking period of approximately 80 minutes. The evidence also showed that the substance resembling sandpaper was in fact a simulated prop, or "mock-up," made of plexiglass to which sand had been applied. However, the examiner found that Rapid Shave could shave sandpaper, even though not in the short time represented by the commercials, and that if

---

[1] 38 Stat. 717, as amended, 52 Stat. 111, 15 U. S. C. § 45 (a) (1) (1958 ed.):

"Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful."

real sandpaper had been used in the commercials the inadequacies of television transmission would have made it appear to viewers to be nothing more than plain, colored paper. The examiner dismissed the complaint because neither misrepresentation—concerning the actual moistening time or the identity of the shaved substance—was in his opinion a material one that would mislead the public.

The Commission, in an opinion dated December 29, 1961, reversed the hearing examiner. It found that since Rapid Shave could not shave sandpaper within the time depicted in the commercials, respondents had misrepresented the product's moisturizing power. Moreover, the Commission found that the undisclosed use of a plexiglass substitute for sandpaper was an additional material misrepresentation that was a deceptive act separate and distinct from the misrepresentation concerning Rapid Shave's underlying qualities. Even if the sandpaper could be shaved just as depicted in the commercials, the Commission found that viewers had been misled into believing they had seen it done with their own eyes. As a result of these findings the Commission entered a cease-and-desist order against the respondents.

An appeal was taken to the Court of Appeals for the First Circuit which rendered an opinion on November 20, 1962. That court sustained the Commission's conclusion that respondents had misrepresented the qualities of Rapid Shave, but it would not accept the Commission's order forbidding the future use of undisclosed simulations in television commercials. It set aside the Commission's order and directed that a new order be entered. On May 7, 1963, the Commission, over the protest of respondents, issued a new order narrowing and clarifying its original order to comply with the court's mandate. The Court of Appeals again found unsatisfactory that portion of the order dealing with simulated props and refused to enforce

it. We granted certiorari, 377 U. S. 942, to consider this aspect of the case and do not have before us any question concerning the misrepresentation that Rapid Shave could shave sandpaper immediately after application, that being conceded.

## I.

A threshold question presented is whether the petition for certiorari was filed within 90 days after the entry of the judgment below as required by 28 U. S. C. § 2101 (c) (1958 ed.). Respondents claim that the failure of the Commission to seek certiorari from the judgment of the Court of Appeals rendered on November 20, 1962, barred a subsequent order prohibiting the use of simulated props in commercials that offer visual proof of a product claim.

After a court of appeals has set aside an order of the Commission on a point of law, the Commission may seek certiorari if it disagrees with the court's legal conclusion. Section 5 (i) of the Federal Trade Commission Act [2] contemplates that when the time for filing a petition for certiorari has passed without a petition being filed, the Commission will enter an order in accordance with the mandate of the court of appeals. The Commission may not merely restate its former position in a new order and then apply for certiorari when the court of appeals reit-

---

[2] 52 Stat. 114, as amended, 15 U. S. C. § 45 (i) (1958 ed.):

"If the order of the Commission is modified or set aside by the court of appeals, and if (1) the time allowed for filing a petition for certiorari has expired and no such petition has been duly filed, or (2) the petition for certiorari has been denied, or (3) the decision of the court has been affirmed by the Supreme Court, then the order of the Commission rendered in accordance with the mandate of the court of appeals shall become final on the expiration of thirty days from the time such order of the Commission was rendered, unless within such thirty days either party has instituted proceedings to have such order corrected so that it will accord with the mandate, in which event the order of the Commission shall become final when so corrected."

erates its previous objection. As was said in *Federal Power Comm'n* v. *Idaho Power Co.*, 344 U. S. 17, 20, "If the court did no more by the second judgment than to restate what it had decided by the first one . . . the 90 days would start to run from the first judgment." To the same effect see *Federal Trade Comm'n* v. *Minneapolis-Honeywell Regulator Co.*, 344 U. S. 206, 211. However, it has also been held that when a reviewing court finds a legal error in an administrative order, the agency is not foreclosed upon the remand of the case from enforcing the legislative policy of the act it administers, provided the new order does not conflict with the reviewing court's mandate.[3]

Obviously, the court which drafted the mandate is normally in the best position to determine whether the Commission's subsequent order is consistent with the mandate, but this Court is never foreclosed from determining the issue for itself.[4] The resolution of this issue in the present case requires a detailed analysis of the various opinions, mandates and orders issued by the Commission and the Court of Appeals.

In its initial opinion, dated December 29, 1961, the Commission commented that the heart of the commercials was the visual "sandpaper test" which was designed to leave the viewer with the impression that he had actually seen such an experiment being performed. The Commission expressed the view that without this visible proof of Rapid Shave's moisturizing ability some viewers might not have been persuaded to buy the product. The Commission then entered into a far-reaching discussion on the

[3] *Securities & Exchange Comm'n* v. *Chenery Corp.*, 332 U. S. 194, 200; *Federal Communications Comm'n* v. *Pottsville Broadcasting Co.*, 309 U. S. 134, 145.

[4] See *Labor Board* v. *Donnelly Garment Co.*, 330 U. S. 219, 227; *Federal Communications Comm'n* v. *Pottsville Broadcasting Co.*, *supra*, note 3, at 141.

use of mock-ups in television and the relationship between "truth" and "television salesmanship," and finally concluded that the use of the plexiglass prop was a deceptive practice. The Commission's order was as inclusive as its discussion. It ordered both repondents to cease and desist from:

> "Representing, directly or by implication, *in describing, explaining,* or purporting to prove the quality or merits of any product, that pictures, depictions, or demonstrations . . . *are genuine or accurate representations* . . . *of,* or prove the *quality or merits of, any product,* when such pictures, depictions, or demonstrations are *not in fact genuine or accurate representations* . . . *of,* or do not prove the quality or merits of, *any such product.*" [5] (Emphasis added.)

The Court of Appeals understandably was concerned with the broad language in the Commission's opinion and order, especially since the Commission was not dealing with an established deceptive practice but was applying the flexible standards of § 5 to a hitherto unexplored area. The breadth of the Commission's order was potentially limitless, apparently establishing a per se rule prohibiting the use of simulated props in all television commercials, since commercials by definition describe "the qualities or merits" of products. The court's impression that the order was "quite ambiguous" was not alleviated when in oral argument counsel for the Commission stated that if a prominent person appeared on television saying "I love Lipsom's iced tea," while drinking something that appeared to be tea but in fact was not, the commercial would be a deceptive practice.

---

[5] 59 F. T. C. 1452, 1477–1478.

In light of the Commission's order and its oral argument, the court concluded that it was the Commission's intention to prohibit all simulated props in television commercials. The court could not agree with this position since it believed that "where the only untruth is that the substance [the viewer] sees on the screen is artificial, and the visual appearance is otherwise a correct and accurate representation of the product itself, he is not injured." [6] But, in setting aside the Commission's order, the court gave little specific guidance for the drafting of a new one. It merely criticized the Commission for holding that mock-ups are "illegal per se," [7] and indicated that the Commission's order "may" have been too broad in other respects as well.

Following the decision by the Court of Appeals, the Commission entered a new "proposed final order" on February 18, 1963. This order was accompanied by an explanatory opinion that admitted error in the original disposition of the case and expressed an intention to eliminate the errors found by the Court of Appeals. The Commission explained that its new order was not directed toward the broad prohibition of all undisclosed simulated props in commercials, but merely toward prohibiting respondents from misrepresenting to the public that it was seeing for itself a test, experiment or demonstration which purportedly proved a product claim. According to the Commission, the television commercial in question did not merely tell viewers that the experiment had been or could be performed, but instead told them that they were seeing it for themselves and did not have to take the seller's word for it. This, and not the mere use of a prop, was the misrepresentation found to be a deceptive practice. Over the vigorous objection of respondents, the

---

[6] 310 F. 2d 89, 94.

[7] *Ibid.*

Commission issued its final order on May 7, 1963. Both respondents were ordered to cease and desist from:

> "Unfairly or deceptively advertising 'any . . . product by presenting a test, experiment or demonstration that (1) is represented to the public as actual proof of a claim made for the product which is material to inducing its sale, and (2) is not in fact a genuine test, experiment or demonstration being conducted as represented and does not in fact constitute actual proof of the claim, because of the undisclosed use and substitution of a mock-up or prop instead of the product, article, or substance represented to be used therein." [8]

Respondents again appealed to the Court of Appeals. Despite the urgings of respondents that it limit its review to a determination whether the Commission's order was consistent with the previous mandate, the court re-examined the Commission's new order on the merits. The court recognized that the new order no longer prohibited the use of all simulated props in commercials, but found that it would be impossible under it to distinguish between commercials which depicted a test, experiment or demonstration, and those which did not. The court held that so long as there is an accurate portrayal of a product's attributes or performance there is no deceit and instructed the Commission, "as we thought we had directed it before," [9] to enter an order merely prohibiting respondents

---

[8] *Colgate-Palmolive Co.*, No. 7736, FTC, May 7, 1963. An additional clause was added to the order for the benefit of respondent Bates in recognition of the different positions of clients and advertising agencies, which often do not have all the information about a product that the client has. The clause reads: "provided, however, that it shall be a defense hereunder that respondent neither knew nor had reason to know that the product, article or substance used in the test, experiment or demonstration was a mock-up or prop."

[9] 326 F. 2d 517, 523.

from using mock-ups to demonstrate something which in fact could not be accomplished.

We hold that the Commission's order of May 7, 1963, was not in disregard of the Court of Appeals' first mandate and was a good-faith attempt to incorporate the legal principles contained therein. An examination of the Commission's first order and accompanying opinion shows an overriding emphasis on mock-ups as such and a failure to articulate with precision the actual deceptive practice found. As a result, it is not surprising that the court criticized the order as "ambiguous," interpreted it as prohibiting the substitution of a mock-up for a product in any commercial, and found that it rested on a premise that mock-ups were "illegal per se." It is true that the court also said that viewers are interested in what they see and not in the means by which they see it, but this statement occurred immediately after the court discussed the contention in oral argument that it would be a deceptive practice to represent that a person was drinking "Lipsom's iced tea" when in fact he was not. The only clear directive in the court's mandate was for the Commission to remove the "fundamental error [which] so permeates the order" [10]—i. e., the error that every use of mock-ups is a deceptive practice.

We find it inconceivable that the Commission could have successfully sought certiorari from this judgment. Had it done so, it would have been forced to argue either that every use of mock-ups in commercials is a deceptive practice, an apparently unintended theory, or that this Court should reinstate the Commission's decision on a theory of its own, something the Court said it would not do in *Securities & Exchange Comm'n* v. *Chenery Corp.,* 332 U. S. 194, 196.

[10] 310 F. 2d 89, 94.

Support is given our conclusion by the refusal of the Court of Appeals to declare that the Commission's subsequent order was inconsistent with the previous mandate. However, even if the first opinion of the Court of Appeals could somehow be construed to hold as a matter of law that it is never a deceptive practice to use undisclosed props in a commercial designed to convince a viewer that he is seeing for himself proof of a seller's claims, we find that the Commission acted reasonably in construing the mandate more narrowly. The Commission's vague first order had spawned a correspondingly vague opinion by the Court of Appeals. If the court meant its first opinion to say more than we have attributed to it, it was not until the second opinion that the court clearly articulated its reasoning. Therefore, at the least the court's second opinion resolved a genuine ambiguity in the first, and the time within which certiorari had to be requested dates from the second judgment. See *Federal Trade Comm'n* v. *Minneapolis-Honeywell Regulator Co.,* 344 U. S. 206, 211.

## II.

In reviewing the substantive issues in the case, it is well to remember the respective roles of the Commission and the courts in the administration of the Federal Trade Commission Act. When the Commission was created by Congress in 1914, it was directed by § 5 to prevent "[u]nfair methods of competition in commerce." [11] Congress amended the Act in 1938 to extend the Commission's jurisdiction to include "unfair or deceptive acts or practices in commerce" [12]—a significant amendment showing Congress' concern for consumers as well as for competitors. It is important to note the generality of these

---

[11] 38 Stat. 719 (1914), as amended, 15 U. S. C. § 45 (a)(1) (1958 ed.).

[12] 52 Stat. 111 (1938), 15 U. S. C. § 45 (a)(1) (1958 ed.).

standards of illegality; the proscriptions in § 5 are flexible, "to be defined with particularity by the myriad of cases from the field of business." *Federal Trade Comm'n* v. *Motion Picture Advertising Service Co.*, 344 U. S. 392, 394.

This statutory scheme necessarily gives the Commission an influential role in interpreting § 5 and in applying it to the facts of particular cases arising out of unprecedented situations. Moreover, as an administrative agency which deals continually with cases in the area, the Commission is often in a better position than are courts to determine when a practice is "deceptive" within the meaning of the Act. This Court has frequently stated that the Commission's judgment is to be given great weight by reviewing courts.[13] This admonition is especially true with respect to allegedly deceptive advertising since the finding of a § 5 violation in this field rests so heavily on inference and pragmatic judgment. Nevertheless, while informed judicial determination is dependent upon enlightenment gained from administrative experience, in the last analysis the words "deceptive practices" set forth a legal standard and they must get their final meaning from judicial construction. Cf. *Federal Trade Comm'n* v. *R. F. Keppel & Bro., Inc.*, 291 U. S. 304, 314.

We are not concerned in this case with the clear misrepresentation in the commercials concerning the speed with which Rapid Shave could shave sandpaper, since the Court of Appeals upheld the Commission's finding on that matter and the respondents have not challenged the finding here. We granted certiorari to consider the Commission's conclusion that even if an advertiser has himself conducted a test, experiment or demonstration which he

[13] See, *e. g., Federal Trade Comm'n* v. *Motion Picture Advertising Service Co.*, 344 U. S. 392, 396; *Federal Trade Comm'n* v. *Raladam Co.*, 316 U. S. 149, 152.

honestly believes will prove a certain product claim, he may not convey to television viewers the false impression that they are seeing the test, experiment or demonstration for themselves, when they are not because of the undisclosed use of mock-ups.

We accept the Commission's determination that the commercials involved in this case contained three representations to the public: (1) that sandpaper could be shaved by Rapid Shave; (2) that an experiment had been conducted which verified this claim; and (3) that the viewer was seeing this experiment for himself. Respondents admit that the first two representations were made, but deny that the third was. The Commission, however, found to the contrary, and, since this is a matter of fact resting on an inference that could reasonably be drawn from the commercials themselves, the Commission's finding should be sustained.[14] For the purposes of our review, we can assume that the first two representations were true; the focus of our consideration is on the third, which was clearly false. The parties agree that § 5 prohibits the intentional misrepresentation of any fact which would constitute a material factor in a purchaser's decision whether to buy.[15] They differ, however, in their conception of what "facts" constitute a "material factor" in a purchaser's decision to buy. Respondents submit, in effect, that the only material facts are those which deal with the substantive qualities of a product.[16] The Com-

---

[14] See *Universal Camera Corp.* v. *Labor Board*, 340 U. S. 474, 488; *Federal Trade Comm'n* v. *Pacific States Paper Trade Assn.*, 273 U. S. 52, 63.

[15] Brief for Petitioner, p. 13; Brief for Respondent Colgate, p. 22; Brief for Respondent Bates, p. 14.

[16] Brief for Respondent Colgate, p. 16: "What [the buyer] is interested in is whether the actual product he buys will look and perform the way it appeared on his television set." *Id.*, at 17: "[A] buyer's real concern is with the truth of the substantive claims or

mission, on the other hand, submits that the misrepresentation of *any* fact so long as it materially induces a purchaser's decision to buy is a deception prohibited by § 5.

The Commission's interpretation of what is a deceptive practice seems more in line with the decided cases than that of respondents. This Court said in *Federal Trade Comm'n* v. *Algoma Lumber Co.*, 291 U. S. 67, 78: "[T]he public is entitled to get what it chooses, though the choice may be dictated by caprice or by fashion or perhaps by ignorance." It has long been considered a deceptive practice to state falsely that a product ordinarily sells for an inflated price but that it is being offered at a special reduced price, even if the offered price represents the actual value of the product and the purchaser is receiving his money's worth.[17] Applying respondents' arguments to these cases, it would appear that so long as buyers paid no more than the product was actually worth and the product contained the qualities advertised, the misstatement of an inflated original price was immaterial.

---

promises made to him, not with the means used to make them." *Id.*, at 20: "[T]he Commission's error was to confuse the substantive claim made for a product with the means by which such claim was conveyed."

Brief for Respondent Bates, pp. 2–3: "If the viewer or reader of the advertisement buys the product, and it will do exactly what the portrayal in the advertisement asserts it will do, can there be any unlawful misrepresentation?" *Id.*, at 13–14: "What induces the buyer to purchase is the claim that the product will perform as represented in the portrayed test. That is the material claim." *Id.*, at 25: "It is not a representation in any way relating to the product or to its purchase, so that even if the strained suggestion that there is such an implied representation were realistic, the representation plainly would be immaterial."

[17] *Federal Trade Comm'n* v. *Standard Education Society*, 302 U. S. 112, 115–117; *Kalwajtys* v. *Federal Trade Comm'n*, 237 F. 2d 654, 656 (C. A. 7th Cir. 1956), cert. denied, 352 U. S. 1025.

It has also been held a violation of § 5 for a seller to misrepresent to the public that he is in a certain line of business, even though the misstatement in no way affects the qualities of the product. As was said in *Federal Trade Comm'n* v. *Royal Milling Co.*, 288 U. S. 212, 216:

> "If consumers or dealers prefer to purchase a given article because it was made by a particular manufacturer or class of manufacturers, they have a right to do so, and this right cannot be satisfied by imposing upon them an exactly similar article, or one equally as good, but having a different origin."

The courts of appeals have applied this reasoning to the merchandising of reprocessed products that are as good as new, without a disclosure that they are in fact reprocessed.[18] And it has also been held that it is a deceptive practice to misappropriate the trade name of another.[19]

Respondents claim that all these cases are irrelevant to our decision because they involve misrepresentations related to the product itself and not merely to the manner in which an advertising message is communicated. This distinction misses the mark for two reasons. In the first place, the present case is not concerned with a mode of communication, but with a misrepresentation that viewers have objective proof of a seller's product claim over and above the seller's word. Secondly, all of the above cases, like the present case, deal with methods designed to get a consumer to purchase a product, not with whether the product, when purchased, will perform up to expectations. We find an especially strong similarity between the pres-

---

[18] *Kerran* v. *Federal Trade Comm'n*, 265 F. 2d 246 (C. A. 10th Cir. 1959), cert. denied *sub nom. Double Eagle Ref. Co.* v. *Federal Trade Comm'n*, 361 U. S. 818; *Mohawk Ref. Corp.* v. *Federal Trade Comm'n*, 263 F. 2d 818 (C. A. 3d Cir. 1959), cert. denied, 361 U. S. 814.

[19] *E. g., Niresk Industries, Inc.* v. *Federal Trade Comm'n*, 278 F. 2d 337 (C. A. 7th Cir. 1960), cert. denied, 364 U. S. 883.

ent case and those cases in which a seller induces the public to purchase an arguably good product by misrepresenting his line of business, by concealing the fact that the product is reprocessed, or by misappropriating another's trademark. In each the seller has used a misrepresentation to break down what he regards to be an annoying or irrational habit of the buying public—the preference for particular manufacturers or known brands regardless of a product's actual qualities, the prejudice against reprocessed goods, and the desire for verification of a product claim. In each case the seller reasons that when the habit is broken the buyer will be satisfied with the performance of the product he receives. Yet, a misrepresentation has been used to break the habit and, as was stated in Algoma Lumber, a misrepresentation for such an end is not permitted.

We need not limit ourselves to the cases already mentioned because there are other situations which also illustrate the correctness of the Commission's finding in the present case. It is generally accepted that it is a deceptive practice to state falsely that a product has received a testimonial from a respected source.[20] In addition, the Commission has consistently acted to prevent sellers from falsely stating that their product claims have been "certified."[21] We find these situations to be indistinguishable from the present case. We can assume that in each the underlying product claim is true and in each the seller actually conducted an experiment sufficient to prove to himself the truth of the claim. But in each the seller has told the public that it could rely on something other than his word concerning both the truth of the claim and

---

[20] E. g., Niresk Industries, Inc. v. Federal Trade Comm'n, supra, note 19; Howe v. Federal Trade Comm'n, 148 F. 2d 561 (C. A. 9th Cir. 1945), cert. denied, 326 U. S. 741.

[21] See, e. g., Stipulation 9083, 55 F. T. C. 2101 (1958); Stipulation 8966, 54 F. T. C. 1953 (1957).

the validity of his experiment. We find it an immaterial difference that in one case the viewer is told to rely on the word of a celebrity or authority he respects, in another on the word of a testing agency, and in the present case on his own perception of an undisclosed simulation.

Respondents again insist that the present case is not like any of the above, but is more like a case in which a celebrity or independent testing agency has in fact submitted a written verification of an experiment actually observed, but, because of the inability of the camera to transmit accurately an impression of the paper on which the testimonial is written, the seller reproduces it on another substance so that it can be seen by the viewing audience. This analogy ignores the finding of the Commission that in the present case the seller misrepresented to the public that it was being given objective proof of a product claim. In respondents' hypothetical the objective proof of the product claim that is offered, the word of the celebrity or agency that the experiment was actually conducted, does exist; while in the case before us the objective proof offered, the viewer's own perception of an actual experiment, does not exist. Thus, in respondents' hypothetical, unlike the present case, the use of the undisclosed mock-up does not conflict with the seller's claim that there is objective proof.

We agree with the Commission, therefore, that the undisclosed use of plexiglass in the present commercials was a material deceptive practice, independent and separate from the other misrepresentation found. We find unpersuasive respondents' other objections to this conclusion. Respondents claim that it will be impractical to inform the viewing public that it is not seeing an actual test, experiment or demonstration, but we think it inconceivable that the ingenious advertising world will be unable, if it so desires, to conform to the Commission's insistence that the public be not misinformed. If, however, it becomes

impossible or impractical to show simulated demonstrations on television in a truthful manner, this indicates that television is not a medium that lends itself to this type of commercial, not that the commercial must survive at all costs. Similarly unpersuasive is respondents' objection that the Commission's decision discriminates against sellers whose product claims cannot be "verified" on television without the use of simulations. All methods of advertising do not equally favor every seller. If the inherent limitations of a method do not permit its use in the way a seller desires, the seller cannot by material misrepresentation compensate for those limitations.

Respondents also claim that the Commission reached out to decide a question not properly before it and has presented this Court with an abstract question. They argue that since the commercials in the present case misrepresented the time element involved in shaving sandpaper, this Court should not consider the additional misrepresentation that the public had objective proof of the seller's claim. As we have already said, these misrepresentations are separate and distinct, and we fail to see why respondents should be sheltered from a cease-and-desist order with respect to one deceptive practice merely because they also engaged in another.

Respondents finally object to what they consider to be the absence of an adequate record to sustain the Commission's finding. It is true that in its initial stages the case was concerned more with the misrepresentation about the product's underlying qualities than with the misrepresentation that objective proof was being given. Nevertheless, both misrepresentations were in the case from the beginning, and respondents were never prejudicially misled into believing that the second question was not being considered. Nor was it necessary for the Commission to conduct a survey of the viewing public before it could determine that the commercials had a tendency to mis-

lead, for when the Commission finds deception it is also authorized, within the bounds of reason, to infer that the deception will constitute a material factor in a purchaser's decision to buy. See *Federal Trade Comm'n* v. *Raladam Co.,* 316 U. S. 149, 152. We find the record in this case sufficient to support the Commission's findings.

## III.

We turn our attention now to the order issued by the Commission. It has been repeatedly held that the Commission has wide discretion in determining the type of order that is necessary to cope with the unfair practices found, *e. g., Jacob Siegel Co.* v. *Federal Trade Comm'n,* 327 U. S. 608, 611, and that Congress has placed the primary responsibility for fashioning orders upon the Commission, *Federal Trade Comm'n* v. *National Lead Co.,* 352 U. S. 419, 429. For these reasons the courts should not "lightly modify" the Commission's orders. *Federal Trade Comm'n* v. *Cement Institute,* 333 U. S. 683, 726. However, this Court has also warned that an order's prohibitions "should be clear and precise in order that they may be understood by those against whom they are directed," *Federal Trade Comm'n* v. *Cement Institute, supra,* at 726, and that "[t]he severity of possible penalties prescribed . . . for violations of orders which have become final underlines the necessity for fashioning orders which are, at the outset, sufficiently clear and precise to avoid raising serious questions as to their meaning and application." *Federal Trade Comm'n* v. *Henry Broch & Co.,* 368 U. S. 360, 367–368.

The Court of Appeals has criticized the reference in the Commission's order to "test, experiment or demonstration" as not capable of practical interpretation. It could find no difference between the Rapid Shave commercial and a commercial which extolled the goodness of ice cream while giving viewers a picture of a scoop of mashed

potatoes appearing to be ice cream. We do not understand this difficulty. In the ice cream case the mashed potato prop is not being used for additional proof of the product claim, while the purpose of the Rapid Shave commercial is to give the viewer objective proof of the claims made. If in the ice cream hypothetical the focus of the commercial becomes the undisclosed potato prop and the viewer is invited, explicitly or by implication, to see for himself the truth of the claims about the ice cream's rich texture and full color, and perhaps compare it to a "rival product," then the commercial has become similar to the one now before us. Clearly, however, a commercial which depicts happy actors delightedly eating ice cream that is in fact mashed potatoes or drinking a product appearing to be coffee but which is in fact some other substance is not covered by the present order.

The crucial terms of the present order—"test, experiment or demonstration . . . represented . . . as actual proof of a claim"—are as specific as the circumstances will permit. If respondents in their subsequent commercials attempt to come as close to the line of misrepresentation as the Commission's order permits, they may without specifically intending to do so cross into the area proscribed by this order. However, it does not seem "unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." *Boyce Motor Lines, Inc.* v. *United States,* 342 U. S. 337, 340. In commercials where the emphasis is on the seller's word, and not on the viewer's own perception, the respondents need not fear that an undisclosed use of props is prohibited by the present order. On the other hand, when the commercial not only makes a claim, but also invites the viewer to rely on his own perception for demonstrative proof of the claim, the respondents will be aware that the use of undisclosed props in strategic places might be a material deception.

We believe that respondents will have no difficulty applying the Commission's order to the vast majority· of their contemplated future commercials.   If, however, a situation arises in which respondents are sincerely unable to determine whether a proposed course of action would violate the present order, they can, by complying with the Commission's rules,[22] oblige the Commission to give them definitive advice as to whether their proposed action, if pursued, would constitute compliance with the order.

Finally, we find no defect in the provision of the order which prohibits respondents from engaging in similar practices with respect to "any product" they advertise. The propriety of a broad order depends upon the specific circumstances of the case, but the courts will not interfere except where the remedy selected has no reasonable rela-

---

[22] The Commission's rules, 16 CFR § 3.26 (1964 Supp.), provide:

"(b) Any respondent subject to a Commission order may request advice from the Commission as to whether a proposed course of action, if pursued by it, will constitute compliance with such order. The request for advice should be submitted in writing to the Secretary of the Commission and should include full and complete information regarding the proposed course of action.   On the basis of the facts submitted, as well as other information available to the Commission, the Commission will inform the respondent whether or not the proposed course of action, if pursued, would constitute compliance with its order.

"(c) The Commission may at any time reconsider its approval of any report of compliance or any advice given under this section and, where the public interest requires, rescind or revoke its prior approval or advice.   In such event the respondent will be given notice of the Commission's intent to revoke or rescind and will be given an opportunity to submit its views to the Commission.   The Commission will not proceed against a respondent for violation of an order with respect to any action which was taken in good faith reliance upon the Commission's approval or advice under this section, where all relevant facts were fully, completely and accurately presented to the Commission and where such action was promptly discontinued upon notification of rescission or revocation of the Commission's approval."

tion to the unlawful practices found to exist.[23] In this case the respondents produced three different commercials which employed the same deceptive practice. This we believe gave the Commission a sufficient basis for believing that the respondents would be inclined to use similar commercials with respect to the other products they advertise. We think it reasonable for the Commission to frame its order broadly enough to prevent respondents from engaging in similarly illegal practices in future advertisements. As was said in *Federal Trade Comm'n* v. *Ruberoid Co.,* 343 U. S. 470, 473: "[T]he Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past." Having been caught violating the Act, respondents "must expect some fencing in." *Federal Trade Comm'n* v. *National Lead Co.,* 352 U. S. 419, 431.

The judgment of the Court of Appeals is reversed and the case remanded for the entry of a judgment enforcing the Commission's order.

*Reversed and remanded.*

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART joins, dissenting in part.

Under the limited grant of certiorari in this case, the Court must assume that the advertiser can perform the experiment in question and that the demonstration is as simple to execute as it appears on television. The only question here is what techniques the advertiser may use to convey essential truth to the television viewer. If the claim is true and valid, then the technique for projecting that claim, within broad boundaries, falls purely within the advertiser's art. The warrant to the Federal Trade Commission is to police the verity of the claim itself.

---

[23] *Federal Trade Comm'n* v. *National Lead Co.,* 352 U. S. 419, 429; *Federal Trade Comm'n* v. *Ruberoid Co.,* 343 U. S. 470, 473; *Jacob Siegel Co.* v. *Federal Trade Comm'n,* 327 U. S. 608, 612.

I do not agree that the use of "mock-ups" by the television advertiser is of itself a deceptive trade practice. Further, while there was an independent deceptive element in this commercial, I do not think this record justifies the broad remedial order issued by the Commission. I would remand the case to the Commission for further proceedings.

I.

"MOCK-UPS" AS SUCH.

The faulty prop in the Court's reasoning is that it focuses entirely on what is taking place in the studio rather than on what the viewer is seeing on his screen. That which the viewer sees with his own eyes is not, however, what is taking place in the studio, but an electronic image. If the image he sees on the screen is an accurate reproduction of what he would see with the naked eyes were the experiment performed before him with sandpaper in his home or in the studio, there can hardly be a misrepresentation in any legally significant sense. While the Commission undoubtedly possesses broad authority to give content to the proscriptions of the Act, its discretion, as the Court recognizes, is not unbridled, and "in the last analysis the words 'deceptive practices' set forth a legal standard and they must get their final meaning from judicial construction" (*ante,* p. 385). In this case, assuming that Rapid Shave could soften sandpaper as quickly as it does sand-covered plexiglass, a viewer who wants to entertain his friends by duplicating the actual experiment could do so by buying a can of Rapid Shave and some sandpaper. If he wished to shave himself, and his beard were really as tough as sandpaper, he could perform this part of his morning ablutions with Rapid Shave in the same way as he saw the plexiglass shaved on television.

I do not see how such a commercial can be said to be "deceptive" in any legally acceptable use of that term. The Court attempts to distinguish the case where a "celebrity" has written a testimonial endorsing some product, but the original testimonial cannot be seen over television and a copy is shown over the air by the manufacturer. The Court states of this "hypothetical": "In respondents' hypothetical the objective proof of the product claim that is offered, the word of the celebrity or agency that the experiment was actually conducted, does exist; while in the case before us the objective proof offered, the viewer's own perception of an actual experiment, does not exist." *Ante,* at 390. But in both cases the viewer is told to "see for himself," in the one case that the celebrity has endorsed the product; in the other, that the product can shave sandpaper; in neither case is the viewer actually seeing the proof; and in both cases the objective proof does exist, be it the original testimonial or the sandpaper test actually conducted by the manufacturer. In neither case, however, is there a material misrepresentation, because what the viewer sees *is* an accurate image of the objective proof.

Nor can I readily understand how the accurate portrayal of an experiment by means of a mock-up can be considered more deceptive than the use of mashed potatoes to convey the glamorous qualities of a particular ice cream (*ante,* pp. 392–393); indeed, to a potato-lover "the smile on the face of the tiger" might come more naturally than if he were actually being served ice cream.

It is commonly known that television presents certain distortions in transmission for which the broadcasting industry must compensate. Thus, a white towel will look a dingy gray over television, but a blue towel will look a sparkling white. On the Court's analysis, an advertiser must achieve accuracy in the studio even though it results

in an inaccurate image being projected on the home screen. This led the Court of Appeals to question whether it would be proper for an advertiser to show a product on television that somehow, because of the medium, looks better on the screen than it does in real life. 310 F. 2d 89, 94; 326 F. 2d 517, 523, n. 16.

A perhaps more commonplace example suggests itself: Would it be proper for respondent Colgate, in advertising a laundry detergent, to "demonstrate" the effectiveness of a major competitor's detergent in washing white sheets; and then "before the viewer's eyes," to wash a white (not a blue) sheet with the competitor's detergent? The studio test would accurately show the quality of the product, but the image on the screen would look as though the sheet had been washed with an ineffective detergent. All that has happened here is the converse: a demonstration has been altered in the studio to compensate for the distortions of the television medium, but in this instance in order to present an accurate picture to the television viewer.

In short, it seems to me that the proper legal test in cases of this kind concerns not what goes on in the broadcasting studio, but whether what is shown on the television screen is an accurate representation of the advertised product and of the claims made for it.

## II.

### THE COMMISSION'S REMEDY.

The Commission ordered both respondents to cease and desist from using mock-ups in any "test, experiment or demonstration"—in the case of respondent Bates, whether or not relating to Colgate products—as a result of its finding that the use of a plexiglass mock-up in this instance constituted a separate misrepresentation. If that were the only misrepresentation found by the Com-

mission, I would affirm the judgment of the Court of Appeals. The Commission, however, found another misrepresentation, not disputed here, namely, that Rapid Shave would shave sandpaper as quickly as plexiglass, and on this record I cannot say that such finding might not support the Commission's broad order.

In so concluding, some further observations are called for. The Court brings to the support of the Commission's broad order the suggestion that it might be difficult for the Commission to police the reliability of simulated demonstrations, and, further, that the Commission might have cause for concern as to advertisers which have demonstrated a propensity for misrepresentation. The policing factor certainly should not permit the Commission to sweep with the broad brush it has used here, since the same risk of inaccurate reproduction inheres in all commercials, not only those involving tests or experiments. Although the Commission doubtless has wide discretion in fashioning remedies (*ante,* p. 395), I do not believe that an order banning use of all mock-ups can be justified merely on the score of "policing."

There is some indication, however, that the Commission has had troubles with both respondents in the past (see 59 F. T. C. 1452, 1473 and n. 30). If the Commission should find that a pattern of misrepresentations by respondents creates a substantial risk that they will not accurately portray experiments if permitted to continue using mock-ups, the Commission's present order might well be justified. I think the Commission should have an opportunity to make such findings, which were unnecessary under what I believe was its mistaken view of the case.

To that end, I would vacate the judgment of the Court of Appeals and remand the case to the Commission for further proceedings in light of what has been said in this opinion.