AMERICAN GENEALOGIES, INC., et al., Plaintiffs,

v.

UNITED STATES POSTAL SERVICE, Defendant.

Civ. A. No. 88–1612.

United States District Court, District of Columbia.

July 17, 1989.

Edward L. Norwind of Paulson, Nace & Norwind, Washington, D.C., for plaintiffs.

Jay B. Stephens, U.S. Atty., Dist. of Columbia, John D. Bates, Asst. U.S. Atty., and A. Patricia Frohman, Washington, D.C., for defendant.

CHARLES R. RICHEY, District Judge.

Plaintiffs American Genealogies, Inc., Spring Hill Employment, Inc., Spring Hill Data Processing, Inc. and Michael Caputo, the President of these three corporations, filed this suit to challenge the United States Postal Service's decision finding them to have used the mails to further a scheme involving false representations in order to obtain money in violation of 39 U.S.C. § 3005. The Court now has before

it plaintiffs' motion to set aside and vacate the Postal Service's decision and orders, and defendant's motion for summary judgment. Upon consideration of both of these motions, the supporting and opposing legal memoranda, the administrative record, and the underlying law, the Court will deny plaintiffs' motion, and will grant the motion of defendant.

## BACKGROUND

Plaintiffs mailed postcard solicitations to various customers inviting them to purchase a book entitled *The (Addressee's Surname) Family Album.* These books contain general information on searching for one's ancestors, ethnic origins, heraldry, and origins of names. Each book concludes with a section providing a listing of persons in the United States having the same surname as the addressee of the solicitation. At bottom, the dispute in this case is over whether the postcard solicitations for these books accurately reflect the actual contents of these books.

On May 7, 1987, the Postal Service filed a complaint against plaintiffs alleging that these postcards contained false representations in violation of 39 U.S.C. § 3005. More specifically, the Postal Service alleged that one group of these postcards made false representations with respect to the following: that addressee's of these postcards would receive a book principally about their ancestry and family name; the book would include the names and locations of almost every member of the addressee's family in the United States and information about the origin's of the addressee's family; and the majority of the book's contents would be substantially different from a book pertaining to a family with a surname different from that of the addressee.[1] In addition, the Postal Service alleged that

another group of these postcards made false representations by suggesting the following: the addressee of the solicitation is related to the person who signed the solicitation; the person who signed the solicitation performed genealogical research specifically leading to the addressee; addressees responding to the solicitation would receive a book principally about their family name and ancestry; the majority of the contents of the addressee's book would be substantially different from the contents of a book pertaining to an addressee of a different surname; and some of the family names used in *The (name of family) Album* were rare.[2]

A hearing was held before an Administrative Law Judge ("ALJ") on June 24, 1987. At this hearing, the Postal Service called three consumer witnesses and the Postal Inspector; plaintiffs called no witnesses, and introduced no exhibits. Following this hearing, the ALJ issued an Initial Decision in which he found that plaintiffs made the materially false representations alleged by the Postal Service in its Complaint. Based on his findings, the ALJ recommended the issuance of a false representation order and a cease and desist order. Thereafter, plaintiffs filed an appeal with a Judicial Officer of the United States Postal Service wherein they took exception with the ALJ's Findings of Fact and Conclusions of Law and the recordkeeping requirements of paragraph 8 of the proposed cease and desist order.[3] Plaintiffs claimed, *inter alia,* that the recordkeeping requirements imposed by the cease and desist order exceeded the Postal Service's jurisdiction and, even assuming the recordkeeping requirements were within the Postal Service's jurisdiction, they were not reasonably related to the conduct alleged in the Postal Service's

---

1. For the text of this postcard solicitation, see Appendix A.

2. For the text of this postcard solicitation, see Appendix B.

3. The challenged part of the cease and desist order provides that:

   in connection with any enterprise by which Respondent seeks to obtain money or property through the U.S. Mail, [persons covered by

the Order shall] forthwith cease and desist from:

\* \* \* \* \* \*

(8) failing to establish, maintain and make available upon reasonable request of the Postal Inspection Service written records identifying all persons, whether natural or artificial, who write, prepare, compile or otherwise contribute to the content, form, production or distribution of any book.

complaint. Plaintiff also challenged the breadth of the recordkeeping requirement. The Judicial Officer disagreed with all of plaintiffs' exceptions to the ALJ's decision, and affirmed that decision in all respects with the exception of an evidentiary ruling made by the ALJ. Contrary to the ALJ's evidentiary ruling, the Judicial Officer found plaintiff Michael Caputo's admission that he and his three companies were involved in a scheme substantially similar scheme to the one involved in this case relevant to the validity of paragraph 8 of the cease and desist order.

As in their appeal before the Judicial Officer, plaintiffs once again are challenging the ALJ's findings of fact and conclusions of law, and the jurisdiction of the Postal Service to issue paragraph 8 of the cease and desist order as well as the order's breadth. In addition, plaintiffs now claim that the Judicial Officer considered irrelevant evidence in evaluating the validity of paragraph 8 of the cease and desist order, that paragraph 8 of the cease and desist order is vague, and that the Postal Service had an obligation to outline for plaintiffs the information that should have been included in their books.

## THE POSTAL SERVICE'S FINDINGS OF FACT ARE SUPPORTED BY SUBSTANTIAL EVIDENCE, AND THE POSTAL SERVICE HAS COMMITTED NO ERRORS OF LAW.

■ The Administrative Procedure Act vests this Court with power to review decisions of the Postal Service, 5 U.S.C. § 706; the Court's power to review these decisions, however, is limited. "It is plain that '[t]he power ... vested in the Postal Service [by 39 U.S.C. § 3005] may not be interfered with by the courts unless it has exceeded its authority or is palpably wrong.'" *American Testing Institute v. United States Postal Service*, 579 F.Supp. 1345, 1348 (D.D.C.1984) (quoting *N. Van Dyne Advertising Agency, Inc. v. United States Postal Service*, 371 F.Supp. 1373, 1375 (S.D.N.Y.1974)). More precisely, the Court's task in reviewing the Postal Service's findings is to determine whether, upon review of the record as a whole, the

findings are supported by substantial evidence. *Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474, 490, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).

> "[S]ubstantial evidence [is] "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. of New York v. National Labor Relations Board*, 305 U.S. 197, 229 [59 S.Ct. 206, 217, 83 L.Ed. 126] (1938).... This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. *National Labor Relations Board v. Nevada Consolidated Copper Corp.*, 316 U.S. 105, 106 [62 S.Ct. 960, 961, 86 L.Ed. 1305] (1942).

*Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966).

Plaintiffs maintain that there is not substantial evidence in the record to support the Postal Service's conclusion that plaintiffs' postcard solicitations would lead the ordinary person to believe that he or she would be receiving a book primarily about his or her own family name and genealogy and, therefore, contained fraudulent misrepresentations.[4] The Court disagrees with plaintiffs.

Whether representations in advertisements are fraudulent is determined "in the light of the effect advertisements would most probably produce on ordinary minds." *Donaldson v. Read Magazine*, 333 U.S. 178, 189, 68 S.Ct. 591, 597, 92 L.Ed. 628 (1948). Moreover, "[a]dvertisements as a whole may be completely misleading although every sentence separately considered is literally true. This may be because things are omitted that should be said, or because advertisements are composed or purposefully printed in such way as to mislead." *Id.* at 188–89, 68 S.Ct. at 596–97.

■ The Court's review of the postcard solicitations, perhaps the most telling evidence in this case, along with the testimony

---

**4.** *Plaintiff's Motion to Set Aside and Vacate Decision and Orders of U.S. Postal Service at 21.*

of the three consumer witnesses called by the Postal Service refutes plaintiffs' contention that the ordinary person receiving a postcard solicitation from plaintiffs would not believe that he or she was being invited to purchase a book principally about his or her family name and ancestry. Mr. Peter Greenhill, when asked if *The Greenhill Family Album* was what he thought it would be, responded that it was not, and that "[he] was led to believe, by the way the solicitation read, that it was going to trace for [him his] family ancestry."[5] The other two consumer witnesses similarly testified that the books did not measure up to their expectations. Mr. John Devney testified that he expected the book to contain a full genealogical workup of the Devney family,[6] and Mr. John R. Malloy testified that "I was anticipating something more in the Malloy line and I feel I was deceived."[7] In addition, Mr. Malloy testified that "I got a book that, I think, to me was made for just anyone and it's just a form book that could be used for any particular type of name or individual."[8] Accordingly, the Court concludes that the ALJ's findings of fact and conclusions of law, which were adopted by the Judicial Officer, are supported by substantial evidence in the record, and the Court will decline plaintiffs' request to set aside those findings of fact and conclusions of law.

THE POSTAL SERVICE DID NOT EXCEED ITS JURISDICTION IN ISSUING PARAGRAPH 8 OF THE CEASE AND DESIST ORDER, AND THAT ORDER IS REASONABLY TAILORED TO PREVENTING PLAINTIFFS FROM ENGAGING IN SIMILAR MISCONDUCT IN THE FUTURE.

■ Congress has vested the Postal Service with the authority, "[u]pon evidence satisfactory to the Postal Service that any person is engaged in conducting a scheme or device for obtaining money or property through the mail by means of false representations" to issue an order which "requires the person or his representative to cease and desist in any such scheme, device, lottery, or gift enterprise." 39 U.S.C. § 3005(a). Plaintiffs contend that the Postal Service's power to issue cease and desist orders is limited solely to plaintiffs' post card solicitations at issue here, and not to their future activities.[9] As such, plaintiffs argue that the Postal Service lacked jurisdiction to issue paragraph 8 of the cease and desist order, which requires plaintiffs to maintain and make available to the Postal Inspection Service upon reasonable request "written records identifying all persons, whether natural or artificial, who write, prepare, compile or otherwise contribute to the content, form, production or distribution of any book" for which plaintiffs sell in the future through the United States mail. The Court disagrees that the Postal Service's jurisdiction does not allow it to regulate such future conduct.

There is no case law interpreting the extent of the Postal Service's powers under the statutory provision authorizing them to issue cease and desist orders. The language of that statutory provision, however, is similar to the statutory provision authorizing the Federal Trade Commission ("FTC") to issue cease and desist orders,[10] and there exists a line of cases holding that the FTC's authority to deal with unfair competition is not confined to its explicit authorization to issue cease and desist orders pertaining to specific violations of the FTC Act which have been discovered. The language of these cases does not speak

---

5. *Administrative Record,* Volume I at 203.

6. *Administrative Record,* Volume I at 238.

7. *Administrative Record,* Volume I at 246.

8. *Id.*

9. *Plaintiffs' Motion to Set Aside and Vacate Decision and Orders of U.S. Postal Service* at 7–8.

10. *Compare* 15 U.S.C. § 45 (allowing the Federal Trade Commission to issue a cease and desist order upon finding "any unfair method of competition or [a] deceptive act or practice in commerce") *with* 39 U.S.C. § 3005 (authorizing Postal Service to issue a cease and desist order upon learning of a "scheme or device for obtaining money or property through the mail by means of false representations"). The legislative history of the Mail Order Consumer Protection

solely to the Federal Trade Commission, but instead speaks of the powers of administrative agencies in general. Accordingly, the Court concludes that the reasoning of these cases provides important guidance in determining the scope of the Postal Service's jurisdiction.

Plaintiffs' position that the Postal Service's authority is no greater than that expressly conferred by statute was at one time the law of the land. The Supreme Court, however, changed that in 1963 when it held that the Civil Aeronautics Board had jurisdiction to order divestiture in addition to its explicit authorization to issue cease and desist orders. *Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963). The Court reasoned that "where the problem lies within the purview of the Board, ... Congress must have intended to give it authority that was ample to deal with the evil at hand." *Id.* at 312, 83 S.Ct. at 486. The Court further explained that "[a]uthority to mold administrative decrees is indeed like the authority of courts to frame injunctive decrees." *Id.* at 312 n. 17, 83 S.Ct. at 486 n. 17.

The Postal Service, in issuing a mandatory injunction, requiring plaintiffs to keep certain records was undeniably attempting to protect consumers from plaintiffs engaging in future schemes involving fraudulent misrepresentation wherein they use the mails to obtain money. There is no question that the Postal Service is entrusted with the responsibility of protecting consumers from such conduct; the question is whether the regulation of future conduct by plaintiffs is justified here.

In the past, Courts have often permitted the Federal Trade Commission to issue cease and desist orders regulating a broad line of products, even though a violation was discovered with respect to a single product so as "to prevent the resurrection of discontinued practices." *Lee v. Federal Trade Commission,* 679 F.2d 905, 906 (D.C.Cir.1980); *see also Federal Trade Commission v. Colgate–Palmolive, Co.,* 380 U.S. 374, 395, 85 S.Ct. 1035, 1048, 13 L.Ed.2d 904 (1965) (holding that Commission may "frame its order broadly enough to prevent respondents from engaging in similarly illegal activities in the future"); *Federal Trade Commission v. National Lead Co.,* 352 U.S. 419, 431, 77 S.Ct. 502, 510, 1 L.Ed.2d 438 (1957) (explaining that "those caught violating the [Federal Trade Commission] Act must expect some fencing in").

Whether a cease and desist order pertaining to a broad line of products is appropriate depends upon whether the order bears a reasonable relation to the discovered violation. "A judgment regarding 'reasonable relation' in multi-product cases 'depends upon the specific circumstances of the case.' " *Sears, Roebuck and Co. v. Federal Trade Commission,* 676 F.2d 385, 391 (9th Cir.1982) (quoting *Federal Trade Commission v. Colgate–Palmolive,* 380 U.S. 374, 394, 85 S.Ct. 1035, 1048, 13 L.Ed.2d 904 (1965)). Factors that should taken into account in deciding whether there is a "reasonable relation" are the "deliberateness and seriousness of the present violation and the violator's past record" as well as the "adaptability or transferability of the violator's false representation] to other products." *Sears, Roebuck and Co.,* 676 F.2d at 392.

The Postal Service's order directing plaintiffs to cease and desist from "failing to establish, maintain and make available upon reasonable request of the Postal Inspection Service written records identifying all persons, whether natural or artificial, who write, prepare, compile or otherwise contribute to the content, form, production or distribution of any book" for which plaintiffs try to obtain money through the United States Mail bears a reasonable relation to the Postal Service's goal of ensuring

Amendments of 1983 suggests that the investigatory and enforcement powers of the Postal Service were modeled after those of the Federal Trade Commission. *See* S.Rep. No. 98–51, 98th Cong., 1st Sess. 6, *reprinted in* 1983 U.S.Code Cong. & Ad.News 2014, 2019 (stating that the civil penalties contained in 39 U.S.C. § 3012 "would authorize a United States district court to impose a civil penalty, under the conditions imposed by the courts respecting enforcement of the FTC statute, for each violation of a cease and desist order....").

that plaintiffs do not participate in a similar scheme to the one involved here in the future. Plaintiffs are repeat offenders as far as the Mail Order Consumer Protection Act is concerned. This is not the first time that they have violated the Act's prohibition against use of the mails to obtain money through a scheme involving the making of fraudulent representations. At least once before, plaintiffs were involved in a scheme that is strikingly similar to the one involved in this case. Plaintiffs had assisted a Beatrice Bayley with producing and selling by mail a book virtually identical to the one involved in this case.[11] Despite the issuance of a cease and desist order by the Postal Service against Beatrice Bayley and plaintiffs' knowledge of that Order, plaintiffs continued selling virtually the identical book under a different name.[12]

■ The Judicial Officer was correct to overrule the ALJ's evidentiary ruling that plaintiffs' link with Beatrice Bayley was not relevant in determining the reasonableness of the recordkeeping requirements of the cease and desist order. The Court cannot imagine any evidence that would be more relevant. Plaintiffs' prior dealings with Beatrice Bayley show the ease with which plaintiffs can resume the scheme found here to be a violation of 39 U.S.C. § 3005 by merely changing the name under which they do business. By requiring plaintiffs to keep records "identifying all persons, whether natural or artificial, who write, prepare, compile or otherwise contribute to the content, form, production or distribution of any book" sold through the United States mail, the Postal Service will be able to monitor whether plaintiffs once again resume the same scheme, albeit under a different name.

Plaintiffs also ask the Court to vacate the recordkeeping requirements of the cease and desist order on the ground that they are vague, overbroad, and burdensome. The Court will decline plaintiffs' request to vacate the order's recordkeeping requirements on each of these grounds.

■ Plaintiffs' claim that the recordkeeping requirements of the order are vague is not properly before this Court as plaintiff did not raise that claim at the administrative level. *See Washington Ass'n for Television & Children v. Federal Communications Commission,* 712 F.2d 677, 680 (D.C.Cir.1983) (explaining that the general rule is that "claims not presented to the agency may not be made for the first time to a reviewing court"). Because "[a] reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented," *Unemployment Compensation Commission of Territory of Alaska v. Aragon,* 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946), "absent exceptional circumstances, a reviewing court will refuse to consider contentions not presented before the administrative proceeding at the appropriate time." *Getty Oil Co. v. Andrus,* 607 F.2d 253, 256 (9th Cir.1979) (citing *Hormel v. Helvering,* 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037 (1941)). The Court will not entertain plaintiffs' claim that the order is vague since plaintiffs have not even provided an explanation for their failure to raise that claim at the administrative level.

■ Although plaintiffs' claims that the cease and desist order's recordkeeping requirements are overbroad and burdensome are properly before the Court, the Court must reject them because the Court has already found that the recordkeeping requirements are reasonably related to the Postal Service's goal of preventing plaintiffs from engaging in illegal conduct in the future similar to the conduct at issue here. If the Court were to require the Postal Service to frame its order more narrowly so as to embrace only the scheme that was the subject of the Postal Service's, plaintiffs past conduct illustrates that plaintiffs, in all probability, would resume their use of the mails for similar postcard solicitations for books on family names and genealogy, however, under a different alias to make

11. *Administrative Record,* Volume III at 966–67.

12. *Administrative Record,* Volume III at 910.

them less traceable by the Postal Service. The breadth of the order serves the legitimate and salutary purpose of making it difficult, if not impossible, for plaintiffs to resume their unlawful activities.

Finally, the Court must reject plaintiffs' claim that the Postal Service had an obligation to provide plaintiffs with an advisory opinion concerning what material should have been included in their books. Plaintiffs have provided the Court with no authority in support of this claim [13], and the Court has no knowledge of the existence of such authority.

The Court will issue an Order of even date herewith memorializing these findings.

## ORDER

In accordance with the Court's Opinion of even date herewith, it is, by the Court, this 14 day of July, 1989,

ORDERED that Plaintiffs' Motion to Set Aside and Vacate Decisions and Orders of U.S. Postal Service shall be, and hereby is, denied; and it is

FURTHER ORDERED that defendant's motion for summary judgment shall be, and hereby is, granted.

## APPENDIX A

Dear Mr. Cates,

Our book THE CATES FAMILY ALBUM represents our informative knowledge about the location of Cates Families in America.

If individually researched, it would require you to spend thousands of dollars or months of work to search through National and State, government and utility records. These records represent the households of over 200 million people.

We have found the Cates name to be rare and thus the CATES FAMILY ALBUM is a very special limited edition. It is restricted to one book per family and it will be printed only on your specific order. All requests must be received prior to April 15. Orders placed after this date must regretfully be declined.

THE CATES FAMILY ALBUM is a hard bound library edition, serially numbered and accompanied by a letter authenticating the collection of data. To further aid in your research, a copy of HAMMOND'S HISTORICAL ATLAS OF THE WORLD will be included with every order. This book, filled with beautiful collections of illustrated maps, highlights the most significant periods and historical events of civilizations.

(OVER)

THE CATES FAMILY ALBUM lists almost every Cates home in the U.S., which will:

* Facilitate locating relatives and namesakes
* Help initiate relationships with other Cates families
* Aid in the study of Cates migrations and settlements in America with geographical counts
* Educate you in the fundamentals of genealogical research by describing
  1. The history of American origins
  2. The development of family crests
  3. The origin of family names
  4. The recording and documenting of family heritage

This nationwide household and family date search has been expensive and time consuming. We're sure that you will be pleased with the work. If you are not, simply return the book for a full refund of $29.85, and keep, as our gift, Hammond's Historical Atlas of the World.

> Sincerely,
> Elizabeth Ross
> Cates Research Group
> Make check payable to: Elizabeth Ross
> Detach and mail to: Genealogy Room
> P.O. Box 5300
> Scranton, Pa.
> 18505–5300

---

**13.** The Court has read the administrative decision cited to by plaintiffs, *Sharon L. Taylor and Halbert's Inc.*, Dkt. 14/32 (I.D.1983, *aff'd.* 1984). That decision is silent as far as any obligation that the Postal Service may have to tell plaintiffs what information should be included in their books.

APPENDIX B

Dear Mr. Malloy,

Our book THE MALLOY FAMILY AL-BUM represents our informative edition of knowledge about the location of Malloy Families in America.

If individually researched, it would require you to spend thousands of dollars or months of work to search through National and State, government and utility records. These records represent the households of over 200 million people.

We have found the Malloy name to be rare and thus THE MALLOY FAMILY AL-BUM is a very special limited edition. There will be less that 150 books published and they will only be printed upon your specific request. All orders must be received prior to March 18. Orders placed after this date must regretfully be declined.

THE MALLOY FAMILY ALBUM is a hard bound library edition and is gold stamped on a leather textured cover. Each book is serially numbered and accompanied by a letter authenticating the collection of data for this one and only edition. THIS EDITION WILL NEVER BE PRINTED AGAIN.

P.S. You are already in this book.

(OVER)

THE MALLOY FAMILY ALBUM lists almost every Malloy home in the U.S., which will:

* Facilitate locating relatives and namesakes
* Help initiate relationships with other Malloy families
* Aid in the study of the Malloy migrations and settlements in America with geographical counts
* Educate you in the fundamentals of geographical research by describing:
  1. The history of American origins
  2. The development of family crests
  3. The origin of family names
  4. The recording and documenting of family heritage

This nationwide household and family data search has been expensive and time consuming. We're sure that you will be pleased with the work. If you are not, simply return the book for a full refund of $29.85.

Sincerely,
Elizabeth Malloy Ross

Make checks payable to: Elizabeth Ross

Detach and mail to: Genealogy Room
P.O. Box 5300
Scranton, Pa.
18505–5300