CABLEVISION COMPANY, Plaintiff,

v.

MOTION PICTURE ASSOCIATION OF
AMERICA, INC., et al., Defendants
(Two Cases).

NATIONAL CABLE TELEVISION
ASSOCIATION, INC., Plaintiff,

v.

COLUMBIA PICTURES INDUSTRIES,
INC., et al., Defendants.

Civ. A. Nos. 83–1655, 83–2785
and 84–3097.

United States District Court,
District of Columbia.

July 31, 1986.

Mark J. Tauber, Michael A. Schlanger, Piper & Marbury, Washington, D.C., for plaintiffs in Civ. A. Nos. 83–1655 and 84–3097.

Jay E. Ricks, David J. Saylor, Elliot M. Mincberg, Hogan & Hartson, Washington, D.C., for plaintiff in Civ. A. No. 83–2785.

Arthur Scheiner, Dennis Lane, Wilner & Scheiner, Philip H. Schaeffer, Jon A. Baumgarten, Paskus, Gordon & Hyman, Washington, D.C., for defendants.

OPINION

JUNE L. GREEN, District Judge.

These matters are before the Court on cross-motions for summary judgment, the respective opposition and reply briefs to the motions, a hearing on the motions, and the entire record herein.

### I. *Background*

This civil action consists of three separately filed complaints which seek a judicial interpretation of a phrase contained in Section 111(d) of the Copyright Act of 1976, Pub.L. No. 94–553, 90 Stat. 2541 (1978) (codified at 17 U.S.C. §§ 101 *et seq.*) Plaintiff Cablevision Company ("Cablevision") filed two of those complaints, Civil Action Nos. 83–1655 and 84–3097. Cablevision provides cable television services to subscribers residing in Nassau, Westchester, and Suffolk Counties, New York, and in Bayonne and Bergen Counties, New Jersey. Plaintiff National Cable Television Association, Inc. ("NCTA") filed the third complaint, Civil Action No. 83–2785. NCTA is a trade association whose members include owners and operators of cable television systems in the United States. Cablevision, a member of NCTA, is also a plaintiff-intervenor in the *NCTA* action. *See* March 20, 1984, Order granting Cablevision's Motion to Intervene.

The defendants are the same in all three cases. They include eight copyright owners, co-owners or exclusive licensees of

public performance, distribution and rights to the motion pictures which are the subject of this dispute and a trade association which represents the interests of these copyright owners. These copyright owners are Columbia Pictures Industries, Inc., Embassy Communications, MGM/UA Entertainment Co., Orion Pictures Corporation, Paramount Pictures Corporation, Twentieth Century-Fox Film Corporation, Universal City Studios, Inc., Warner Bros. Inc., and the Motion Picture Association of America ("Copyright Owner Defendants"). The U.S. Copyright Office and its Register ("Copyright Office Defendants") were joined as necessary party defendants in a separate count of an amended complaint pursuant to an order of this Court. *See* July 17, 1984, Order and Amended Complaint filed August 20, 1984. The Copyright Office is an office of the Library of Congress in Washington, D.C., which has certain responsibilities with respect to the Copyright Act of 1976 pursuant to that Act. The Register of Copyrights is the officer in charge of the Copyright Office.

Plaintiffs' complaints seek a declaratory judgment as to the proper interpretation of Section 111(d) of the Copyright Act of 1976, concerning the amount of gross receipts included in calculating the payment of copyright royalty fees by cable television systems for the basic service of providing secondary transmissions of primary broadcast transmitters. Both plaintiffs claim that the defendants interpret improperly section 111(d) so as to require cable operators to overpay substantially their copyright royalty fees and thereby unjustly enrich defendants. Moreover, Cablevision requests an order restraining Copyright Owner Defendants from instituting any further action against it for copyright infringement and such other relief as may be appropriate.

The defendants disagree with plaintiffs' reading of section 111(d). They argue instead that the plaintiffs' interpretation of the statute results in an underpayment of royalties. Defendant Copyright Owners filed a counterclaim for copyright infringement, statutory damages, injunctive relief, costs, and attorneys fees.

Before the Court discusses more fully the positions of the parties in this dispute, a short overview of section 111(d) and the development of the cable industry is in order.

## A. The Copyright Revision Act of 1976

The Copyright Revision Act of 1976, 17 U.S.C. §§ 101 *et seq.*, established a compulsory copyright license for the retransmission of television broadcast signals by cable systems. The Act was the culmination of congressional efforts to respond to the Supreme Court's decisions in *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968), and *Teleprompter Corp. v. CBS, Inc.*, 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974), which held that the distribution of television broadcasts was not a "performance" so as to be protected by the Copyright Act of 1909. Consequently, the cable operators were not required to make royalty payments to the copyright owners. The Court stated in *Teleprompter* that "any ultimate resolution of the many sensitive and important problems in this field ... must be left to Congress." 415 U.S. at 414, 94 S.Ct. at 1141.

Congressional efforts to safeguard the interest of the creators of copyright material being distributed on cable systems, while still allowing for the fullest development of the public's right of access to information through cable technology, began in 1964 and was followed quickly by the introduction of bills in 1965, 1966, 1967, 1969, 1971, 1973, and 1975, leading to the passage of the revised Copyright Act of 1976. *See The Cable Television Provisions of the Revised Copyright Act*, 27 Cath.U.L.Rev. 263, 279 n. 64 (1978). Congress realized that it would be impractical, if not impossible, for each and every cable operator to negotiate directly with every copyright owner and embarked upon a new approach.

This new approach required cable operators to obtain a compulsory license in order to retransmit television programs. Copy-

right owners of motion pictures and/or other works that are embodied in the retransmitted signals are compelled to license these works to cable systems in return for which they are compensated through the payment of semi-annual fees by individual cable systems. These semi-annual royalty fees are computed in accordance with a statutory formula based upon gross receipts from a basic statutory service.

The royalty schedule formula was the result of last-minute negotiations between the copyright owners and the cable television industry and, with some modifications, is found in section 111(d)(2)(B) which provides for the fee to be

> computed on the basis of specific percentages of the gross receipts from subscribers to the cable service during said period for the basic service of providing secondary transmissions of primary broadcast transmitters....

17 U.S.C. 111(d)(2)(B). The royalty fees are then distributed to those copyright owners whose works were the subject of secondary transmissions of broadcast signals. The Copyright Tribunal ("Tribunal"), an independent agency of the legislative branch, determines the formulae for dividing the fees among the copyright owners. The Tribunal is also authorized to " ... adopt regulations ... governing its procedures and methods of operation...." 17 U.S.C. § 803.

Semi-annual statements of account which list the broadcast signals carried by the cable system operators must also be filed with the semi-annual royalty payments. Cable systems with semi-annual gross receipts below $146,000 pay a flat royalty fee

($28) regardless of the number of distant signals carried, and are known as "Form 1" systems. 17 U.S.C. § 111(d)(2)(C); 37 C.F.R. § 308.2(b)(1) (1985). Cable systems with semi-annual gross receipts of $146,000 to $292,000, commonly known as "Form 2" systems, pay a royalty fee based on a set percentage of gross receipts regardless of the number of distant signals. 17 U.S.C. § 111(d)(2)(D); 37 C.F.R. § 308.2(b)(2) (1985).

Major cable systems with semi-annual gross receipts in excess of $292,000, known as "Form 3" systems, pay royalty fees based on a percentage of gross receipts, but the percentage varies with the number and nature of the broadcast signals retransmitted. The licensing fee of the major cable operators is based upon a percentage of gross receipts derived from basic subscriber charges multiplied by the number of distant signal equivalents ("DSE") carried. A DSE is a numerical value assigned to the secondary transmission of a non-network television program beyond the local service area of the primary transmitter by a cable system. 17 U.S.C. § 111(f). Different DSE values are assigned to three types of stations (independent, network affiliated, and noncommercial educational) that can be retransmitted as distant signals.[1] *Id. See* Copyright Owner Defendants' Motion for Summary Judgment on Phase One Issue at 10–12, filed March 2, 1984, for a detailed explanation of Form 3 System royalty fee calculation.

Congress defined the terms "secondary transmissions" and "primary transmissions" used in section 111(d)(2)(B) of the Act.[2] It failed, however, to define specifi-

---

**1.** A greater distant signal equivalent ("DSE") value is "assigned independent television stations since they almost exclusively carry nonnetwork programming; a lesser value is assigned to network affiliates since they carry only a limited amount of nonnetwork programming." *National Cable TV v. Copyright Royalty Tribunal,* 689 F.2d 1077, 1080 n. 17 (D.C.Cir. 1982).

**2.** A "primary transmission" is a transmission made to the public by the transmitting facility whose signals are being received and further

transmitted by the secondary transmission service, regardless of where or when the performance or display was first transmitted.

> A "secondary transmission" is the further transmitting of a primary transmission simultaneously with the primary transmission, or nonsimultaneously with the primary transmission if by a "cable system" not located in whole or part within the boundary of the forty-eight contiguous States, Hawaii, or Puerto Rico....

17 U.S.C. § 111(f).

cally the terms "gross receipts" or "basic service," the meaning upon which this controversy centers. The Copyright Tribunal, consistent with its mandate and over six months after NCTA filed its complaint, adopted rules of procedure and prepared forms for the use of cable operators to facilitate the filing of periodic statements of account and defined specifically "gross receipts." According to the Tribunal,

[g]ross receipts for the "basic service of providing secondary transmissions of primary broadcast transmitters" include the full amount of monthly (or other periodic) service fees for any and all services or tiers of service which include one or more secondary transmissions of television or radio broadcast signals, for additional set fees, and for converter fees. All such gross receipts shall be aggregated and the DSE calculations shall be made against the aggregated amount.

37 C.F.R. § 201.17(b)(1) (April 2, 1984).

## B. The Development of the Cable Industry

When the 1976 Copyright Act was passed, cable television and ancillary technologies were still developing. Cable television developed originally as a means for transmitting television broadcast signals by wire to the homes of paying subscribers. These cable television systems retransmit both local broadcast signals, received off the air by antennae, and distant broadcast signals, customarily received by terrestrial microwave relay systems or by satellite. Cable television systems also transmit nonbroadcast entertainment and informational programing, i.e., programing that is not originally broadcast by a television station. Such nonbroadcast transmissions are made under individually negotiated copyright licenses.

Early cable systems had limited channel capacity, usually twelve systems or less. The principal use of these channels was for retransmission of local broadcast signals received off the air at a well-placed antenna site and distant broadcast signals imported by microwave. The cable systems offered usually both the local and distant broadcast signals for a single package price. By the early 1970's, a few cable systems began to offer one or more optional tiers of services for an additional charge. The optional tiers usually consisted of one or two channels of commercial-free movies, i.e., Home Box Office ("HBO"), or other entertainment supplied to the cable system by tape or microwave.

A whole new category of nonbroadcast programing emerged as satellite and cable technology developed in the 1970's. This programing today consists of offerings such as ESPN (a sports channel), The Weather Channel, the Health Channel, cultural and religious channels, etc. According to NCTA, "some of these channels are supported principally by advertising" while "others are financed in substantial part by cable systems making direct payments to the supplier for the right to offer the copyrighted programing." NCTA Complaint at 11.

The cable system enters into a written agreement with the program supplier licensing the system to transmit the copyrighted nonbroadcast programing and governing the compensation, advertising rights, and other terms agreed to by the parties. Some cable systems offer the nonbroadcast channels as an optional tier of service at an additional charge. Other systems add the nonbroadcast programing with the system's so-called "basic service" or lowest tier of service and the combined tier is offered at a higher charge. As to the former type of "tiering," the additional tier will sometimes include retransmitted distant broadcast signals. For example, a typical additional tier may include one or more of the satellite delivered broadcast "superstations," i.e., WTBS (Channel 17 in Atlanta) and one or more distant broadcast signals. The marketing practice of "tiering" has become prevalent in the cable industry and cable operators now frequently market their program services in "tiers" consisting of both broadcast and nonbroadcast programing. See 49 Fed.Reg. 13029, 13034 col. 3 (April 2, 1984).

## C. *Positions of the Parties*

The Court notes with interest that plaintiffs Cablevision and NCTA seek different interpretations of the phrase "gross receipts from subscribers to the cable service ... for the basic service of providing secondary transmissions of primary broadcast transmitters" contained in section 111(d) of the Act. Cablevision has interpreted section 111(d)(2)(A) of the Act to require the computation of copyright royalty payments on the basis of the gross receipts paid by subscribers for Cablevision's Basic Service, the tier of service to which all of the subscribers must subscribe prior to receiving any additional tiers of service. Cablevision claims that when the Act was enacted in 1976, the term basic service had a recognized meaning within the cable television industry. "It was the lowest tier of service offered by a cable television system to which all subscribers were required to subscribe before they were permitted to subscribe to any additional tiers of service." Cablevision's Statement of Material Facts as to Which There is No Genuine Issue ¶ 10. Cablevision also asserts that the term " 'basic service' was synonymous with and used interchangeably by the industry with such terms as 'minimum level of service,' 'initial package,' and 'regular subscriber service.' " *Id.* Cablevision's interpretation would exclude from royalty calculations all revenue attributable to an optional tier, whether or not that tier contained distant broadcast programing.

NCTA, on the other hand, argues "that Section 111 of the Act requires the payment of compulsory royalties only for secondary transmissions of primary broadcast transmitters and not for transmissions of other, nonbroadcast programming...." [3] Memorandum of Points and Authorities in Support of NCTA's Renewed Motion and Cross-Motion for Summary Judgment and in Opposition to the Copyright Owners' and Copyright Office's Motions for Summary Judgment ("NCTA's Motion for Summary Judgment") at 19. According to NCTA, such an interpretation would avoid double payment by cable systems for nonbroadcast programing for which negotiated copyright royalties or other forms of compensation have already been paid separately.

The Copyright Owner Defendants take the position that "plaintiff's [Cablevision] private definition of 'basic service' is contrary to section 111's intent and purpose which requires gross receipts from all retransmission services on which any distant or local broadcast signal is provided by the system." Copyright Owner Defendants' Opposition to Plaintiff's Motion for Summary Judgment and Reply in Support of their Motion for Summary Judgment in No. 83–1655 ("Copyright Owner Defendants Opposition") at 10–11. The Copyright Owner Defendants also assert that plaintiff's definition uses terms that were not commonly used in the cable industry in the period 1970–1976 and is not the definition used by Congress, the FCC, the franchising authorities with whom plaintiff dealt, or even by the plaintiff. *Id.* at 28. They insist that Cablevision's definition relates to marketing practices alone and not to areas of either congressional or FCC concern.

The Copyright Office Defendants support the arguments made by the Copyright Owner Defendants. Moreover, the Copyright Office argues that its published interpretation of section 111 is entitled to substantial deference by the Court given its expertise in copyright law and therefore should not be overturned since it is not arbitrary, capricious or otherwise not in accordance with law. As to NCTA's allocation of receipts argument, the Copyright Office contends that "[t]here is simply no provision in the copyright law for the allocation of gross receipts for the actual reception by subscribers of each individual copyrighted work." Federal Defendants' Opposition to Plaintiff's Cross-Motions for Summary Judgment at 18. They assert

---

**3.** NCTA also challenges the meaning of the term "cable system" as defined in Section 111(f), Title 17, United States Code. Because the Court finds that this issue relates to the definition of a cable system, *see* 17 U.S.C. § 111(f), an issue not presently before the Court, it will not be addressed.

that "[a] licensing system that would permit every cable operator to account for the retransmission of each broadcast signal containing a copyrighted program would be unworkable within the statutory scheme set by Congress." *Id.* at 17–18.

## II. *Discussion*

### A. *Standard of Review*

It is a well-settled principle that "the construction put on a statute by the agency charged with administering it is entitled to deference by the courts, and ordinarily that construction will be affirmed if it has a 'reasonable basis in law.'" *Volkswagenwerk v. FMC*, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968) (citing *NLRB v. Hearst Publications*, 322 U.S. 111, 131, 64 S.Ct. 851, 860–861, 88 L.Ed. 1170 (1944)). "Nevertheless, while informed judicial determination is dependent upon enlightenment gained from administrative experience," *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 385, 85 S.Ct. 1035, 1042–1043, 13 L.Ed.2d 904 (1965), the courts are the final authorities on issues of statutory construction. Judicial deference cannot be blind or absolute and courts "are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Volkswagenwerk v. FMC*, 390 U.S. at 272, 88 S.Ct. at 935 (citing *NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)). *See also Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983).

The Supreme Court recently reinforced the concept of judicial deference to an expert agency's statutory interpretation in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In *Chevron*, the Court held that "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." 467 U.S. at 844, 104 S.Ct. at 2782

(footnote omitted). The Court further stated that

> the principle of deference to administrative interpretations "has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations."

*Id.* (citations omitted).

Under the *Chevron* view, a court's first task when reviewing an agency's construction of the statute which it administers is to determine whether Congress has directly spoken to the precise question at issue. If Congress has not, "the Court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather ... the question is whether the agency's answer is based on a permissible construction of this statute." 467 U.S. at 842–43, 104 S.Ct. at 2782 (footnote omitted). *See also Am. Fed. of Gov. Employees v. FLRA*, 778 F.2d 850, 856 (D.C.Cir.1985).

### B. *Statutory Language*

The statutory language of section 111(d) that this controversy centers around is the phrase *"gross receipts* from subscribers to the cable service during said period for the *basic service* of providing secondary transmissions of primary broadcast transmitters...." 17 U.S.C. § 111(d)(2)(B) (emphasis added). As noted previously, Congress failed to define the terms "gross receipts" and "basic service," two terms whose definitions affect greatly the calculation of royalty fees due to copyright owners under the compulsory licensing scheme embodied in section 111(d). The Copyright Office, however, subsequently defined "gross receipts" in the context of the statute so as to "include the full amount of monthly (or other periodic) service fees *for any and all services or tiers of service* which include one or more secondary transmissions [local

or distant] of television or radio broadcast signals, for additional set fees, and for converter fees." 37 C.F.R. § 201.17(b)(1) (1984). It is this interpretation that both plaintiffs challenge for reasons already cited.

Based on an examination of the legislation and its history, the Court finds that the Copyright Office's definition of "gross receipts" does not have a reasonable basis in law and frustrates the underlying congressional policy.

The Copyright Office Defendants take the position that,

[w]here broadcast signals subject to compulsory licensing under section 111 are offered *in combination with* nonbroadcast services such as HBO, as a package, the revenues from both tiers must be combined for reporting purposes.... The requirement is clear. *Whenever the two types of service are offered for a single price or, if on separate tiers, whenever it is necessary to subscribe to one tier in order to receive another,* the two services are in reality being offered as a single package of service; if secondary transmissions are included in the package, gross receipts from both tiers or the combined package must be reported and used in calculating copyright royalties.

Letter from Dorothy Schrader, Copyright Office General Counsel, filed June 20, 1986 ("Schrader Letter") at 2 (emphasis in original).

Under the present definition of "gross receipts," cable system operators like plaintiff Cablevision are forced to pay royalties on nonbroadcast signals for which they have already paid simply because these signals are contained in a tier of service with a secondary transmission signal. This seems unfair to the Court. For example, all parties concede that if an operator markets all his broadcast channels (local and distant signals) in one tier for $10 and separately offers HBO or another movie service for $9, the compulsory royalty fee would be calculated on a $10 base. NCTA's Motion for Summary Judgement at 24–25 (citing

Copyright Owner Defendants' Response to Plaintiff [NCTA's] Request for Admission 17). However, if that same operator combines services so that the only available package includes the broadcast channels and the movie channel for $19, under the present definition of "gross receipts" all $19 must be used to compute the broadcast royalty fee. *Id.* Surely, Congress did not intend such an anomalous result.

Congress established the compulsory license fee in the Copyright Act to "compensate the owners of syndicated programming initially broadcast in communities remote from the cable system." *National Cable TV v. Copyright Royalty Tribunal,* 689 F.2d 1077, 1079 (D.C.Cir.1982). As explained by the Court of Appeals in that case,

[t]he Act's compulsory license enables cable systems to offer subscribers essentially three types of "basic" service: (a) signals of local stations that are otherwise poorly received, (b) national programming from affiliates of the three commercial networks, regardless of the location of the broadcast station, and (c) non-network or "syndicated," programming originating in a community distant from the cable system. As a result of secondary transmissions, advertisers supporting the first two types of programming reach a larger portion of their intended audience (local and national, respectively). Thus, cable carriage permits the originating station to raise its advertising rates and thereby increase its payments to program producers. The market does not, however, as naturally compensate the owners of syndicated programming initially broadcast in communities remote from the cable system. Such programming is generally sponsored by local advertisers with little or no interest in the distant cable audience.

Consequently, the Copyright Act requires cable operators to pay royalties as a function of the "distant signal equivalents" (DSEs) they carry. Since it would be impractical for each operator to pay the copyright owners of syndicated pro-

gramming directly, the Act obliges the operators to pay fees into a royalty pool controlled by the Tribunal which, in turn, determines the appropriate share for different types of copyright owners. The fees are calculated as a percentage of gross receipts from basic subscriber charges, varying according to the number of DSEs carried.

*Id.* at 1079–80 (footnotes omitted).

Given the rationale behind the compulsory license system, the Court finds that Congress did not intend to include revenues from nonbroadcast programing in the calculation of "gross receipts." The congressional reports accompanying the legislation stated that "copyright liability of cable television systems under the compulsory license should be limited to the retransmission of distant non-network programing." H.R.Rep. No. 1476, 94th Cong., 2d Sess. (1976) at 90, U.S.Code Cong. & Admin. News 1976, pp. 5659, 5705. Furthermore, the report states that "[f]or the purposes of computing royalty payments, only receipts for the basic service of providing secondary transmissions of primary broadcast transmitters are to be considered. Other receipts from subscribers, such as those for pay-cable services ... are not included in gross receipts." *Id.* at 96, U.S. Code Cong. & Admin.News 1976, p. 5710. This language makes clear Congress' intent to exclude revenues attributable to nonbroadcast signals from the calculations of "gross receipts" under section 111(d). All parties to this controversy would without a doubt agree with this conclusion.

The real point of contention is the Copyright Office Defendants' definition of "gross receipts" which includes revenues from nonbroadcast signals when these signals are offered in combination with broadcast signals subject to compulsory licensing under section 111. According to the Copyright Office, *"[w]henever the two types of service are offered for a single price or, if on separate tiers, whenever it is necessary to subscribe to one tier in order to receive another,* the two services are in reality being offered as a single package of

service ..." and "gross receipts from both tiers or the combined package must be reported and used in calculating copyright royalties." Schrader Letter at 2. NCTA argues that this method of calculating gross receipts results in an inequitable double payment and thus is an unreasonable interpretation of the statute. The Court agrees.

Nonbroadcast signals are obtained by cable operators through privately negotiated contracts which compensate fully the copyright owners for such programing. The definition of "gross receipts" promoted by the defendants results in a "double payment" to the copyright owners since they would receive payment directly from the cable operator pursuant to a contract and again from the Copyright Royalty Tribunal. The Court finds that the mere inclusion of nonbroadcast signals on the same tier with broadcast signals does not magically transform the nonbroadcast signals into signals now subject to the compulsory licensing scheme. They remain outside the licensing scheme and any revenues attributable to them should not be included in the calculation of "gross receipts." A contrary conclusion would contravene the congressional intent to limit royalty payments under the Act to distant non-network programing.

Next the Court must define the term "basic service." Cablevision defines this term as the lowest tier of service offered by a cable television system to which all subscribers are required to subscribe before they can subscribe to any additional tiers of service. Cablevision's interpretation of section 111 excludes revenues from any optional tier of service, whether or not it contains distant signals. Cablevision also contends that "basic service" is synonymous with the Federal Communications Commission ("FCC") terminology such as "minimum level of service," "initial package," and "regular subscriber service." The Copyright Owner Defendants disagree with Cablevision's definition and assert instead that plaintiff's private marketing definition of "basic service" bears no relation-

ship to the statutory definition intended by Congress. Moreover, the Copyright Owner Defendants argue that section 111 requires the reporting of *all* revenues attributable to both local and distant signals. The Court agrees with the Copyright Owner Defendants.

First, the Court dismisses Cablevision's assertion concerning the synonymous meaning of the term "basic service" with supposedly similar terms used by the FCC. The Court finds that the FCC terms are to be construed independent of and differently from those used in section 111 of the Copyright Act. The FCC and the Copyright Office are federal agencies charged with different areas of responsibility and focus. Terms which appear to mean the same standing alone may, when placed in their proper context, hold a very different meaning. For this reason, the Court will consider this particular contention of Cablevision no further.

Second, the Court finds that the term "basic service" has already been defined by the U.S. Court of Appeals for the District of Columbia in *National Cable TV v. Copyright Royalty Tribunal.* In *National Cable TV,* the Court defined "basic service" to include the following secondary transmissions: (a) local signals, (b) national network signals, and (c) distant signals. 689 F.2d 1079. Although the Court in that case did not have the precise issue of the statutory definition of "basic service" before it, this fact in no way diminishes the weight to be given to that Court's definition. Accordingly, the Court finds that it is bound by the definition given to the term "basic service" by the highest court in this Circuit and hereby incorporates that definition into this opinion.

In light of this definition, the Court holds further that the calculation of "gross receipts from subscribers to the cable service ... for the basic service of providing secondary transmissions ...", 17 U.S.C. § 111(d)(2)(B), should include all revenues produced by the retransmissions of *local and distant signals* no matter what tier of service the signal is included. Like non-broadcast signals, signals designated as being a part of a cable system's "basic service" do not lose that designation simply by being placed on a higher tier or on a mixed tier. A different conclusion would subvert Congress' express intention of providing compensation to copyright owners of retransmitted distant signals through implementation of the compulsory license statutory scheme.

As noted in the congressional records on section 111,

> [the] retransmission of distant non-network programing by cable systems causes damage to the copyright owner by distributing the program in an area beyond which it has been licensed. Such retransmission adversely affects the ability of the copyright owner to exploit the work in the distant market. It is also of direct benefit to the cable system by enhancing its ability to attract subscribers and increase revenues. For these reasons, the Committee [on the Judiciary] has concluded that the copyright liability of cable television systems under the compulsory license should be limited to the retransmission of distant non-network programing [distant signals].

H.R.Rep. No. 1476, 94th Cong., 2d Sess. (1976) at 90, U.S.Code Cong. & Admin. News 1976, p. 5705.

If the Court were to rule in a manner so as to limit the calculation of "gross receipts" to include only the revenues attributable to signals contained on the lowest or first tier of service, cable operators like Cablevision would be free to tailor their marketing practices in such a way as to lower their royalty payments at the expense of the copyright owners. Under the method of calculation suggested by the Court today, the cable operators are asked to do nothing more than Congress intended—compensate the copyright owners for the retransmission of distant signals.

### III. *Conclusion*

The Court concludes that any calculation of gross receipts under section 111(d) of the Copyright Act of 1976 must include the revenues from both local and distant sig-

nals notwithstanding their tier placement. Any revenues attributable to nonbroadcast signals are excluded from this calculation. The Court holds that this conforms to the phrase "gross receipts from subscribers to the cable service during said period for the basic service of providing secondary transmissions of primary broadcast transmitters...." 17 U.S.C. § 111(d)(2)(B). The Court, therefore, orders the Copyright Office and its Register to amend their definition of "gross receipts" contained in 37 C.F.R. § 201.17(b)(1).

The Copyright Royalty Tribunal shall recalculate the amount of royalty payments owed by plaintiff Cablevision based on this holding of the Court. It is beyond the province of the Court to dictate the specific method of calculating the royalties to be paid by Cablevision. In the instance where local or distant signals are offered in a combination package with other signals at a discount price, the amount to be used in calculating the gross receipts of that package must represent the price of the distant signal before the discount is taken. For instance, if a cable system provides superstations WTBS and WOR–TV (distant signals) on Tier I for $2.00, CNN and ESPN (nonbroadcast signals) on Tier II for $2.00, or both tiers together in a package for $3.00, the Copyright Royalty Tribunal should use $2.00 out of the $3.00 discount price for the combined package in calculating the broadcast retransmission royalty so that the copyright owners are not penalized when "bargain" combinations are made.

Finally, the Court dismisses the counterclaims for statutory damages, as specified in 17 U.S.C. §§ 504(c)(1) and (2), for copyright infringement, injunctive relief, costs, and attorneys fees. The counterclaims allege that Cablevision's failure to file true and complete statement of accounts and to pay the royalty fees provided in 17 U.S.C. § 111(d) which are prerequisites for obtaining compulsory licenses while retransmitting their copyrighted works constitutes copyright infringement. The Court cannot agree with defendants.

The Court finds that while Cablevision did not comply with the letter of the copyright law as interpreted by the Copyright Office and its Register during the relevant period, it did comply with the spirit of the law. After all, not only did Cablevision remit checks totaling over $800,000 to cover royalty payments based on its narrow interpretation, but it also posted a nearly $2 million surety bond to cover the difference between that amount and the amount the Copyright Office claimed was due. These are not the acts of a copyright infringer. Accordingly, the only recovery due to the Copyright Owner Defendants is that provided in section 111(d)(2)(B) of the Copyright Act—royalty payments.