**MOTION PICTURE ASSOCIATION OF AMERICA, INC., Plaintiff,**

v.

**Ralph OMAN, Register of Copyrights, Defendant,**

**National Cable Television Association, Inc., Defendant–Intervenor.**

Civ. A. No. 89–1246 SSH.

United States District Court, District of Columbia.

Oct. 31, 1990.

---

Jon Baumgarten, Arthur Scheiner, Washington, D.C., for Motion Picture Ass'n.

Brenda Lee Fox, Seth Alan Davidson, Loretta Pauline Polk, Stuart Frank Feldstein, Washington, D.C., for National Cable Television.

Nathan Dodell, Asst. U.S. Atty., Washington, D.C., for Ralph Oman.

## OPINION

STANLEY S. HARRIS, District Judge.

This matter is before the Court on plaintiff's motion for summary judgment and on defendant's and defendant-intervenor's cross-motions for summary judgment. Plaintiff seeks a declaratory judgment that a Copyright Office regulation is invalid for its failure to retroactively assess interest on late royalty payments. Defendant and intervenor seek to uphold the regulation as valid. For the reasons set forth below, plaintiff's motion is denied, and defendant's and intervenor's motions are granted.

### Background

The Motion Picture Association of America, Inc. (MPAA), on behalf of television broadcast copyright owners, contests a Copyright Office regulation which imposed interest charges *in futuro* for late royalty payments owed by cable operators to the Copyright Royalty Tribunal for distribution to copyright owners, because it did not assess interest on late payments both retroactively and prospectively.

In 1986, Cablevision, a cable system operator, and the National Cable Television Association, Inc., (NCTA), a national trade association, brought suit against various copyright owners and the MPAA, seeking to obtain a declaratory judgment invalidating the Copyright Office's interpretation of the cable compulsory license, § 111(d) of the Copyright Act of 1976.[1] Cablevision

---

1. The cable compulsory license allows cable systems to retransmit the signals of broadcast television stations containing copyrighted programs, provided that they file semi-annual financial statements and pay a statutory royalty fee. At an early period in the history of the cable industry, the Supreme Court established that retransmissions by cable television systems of broadcast programming did not constitute "performances" under the copyright law and "thus did not give rise to liability for infringement." *See Cablevision Systems Development Co. v. MPAA*, 836 F.2d 599, 602 (D.C.Cir.), *cert. denied*, 487 U.S. 1235, 108 S.Ct. 2901, 101 L.Ed.2d 934 (1988) (*Cablevision II*), citing *Teleprompter Corp. v. Columbia Broadcasting System*, 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974) and *Fortnightly Corp. v. United Artists Television*, 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968). The Supreme Court made clear that it was up to Congress, and not the courts, to rectify this situation if necessary. *Id.* Consequently, the license is a recognition by Congress that copyright owners are entitled to share in the proceeds generated by retransmission of their copyright works. *Id.* But Congress also realized that the cost of cable operators negotiating individually for the use of each copyright program could be prohibitively high. Thus, they enacted a statutory scheme whereby cable systems would pay a mandatory fee to rebroadcast such material. The method for calculating the fee, found generally at 37 C.F.R. § 201.17 (1989), depends on the number of distant signals the cable system transmits and the system's gross receipts. The smaller cable systems pay a flat statutory rate, while the larger systems pay proportionally depending on the number of distant signals they transmit.

successfully argued that the Copyright Office's reading of § 111(d), as measured by the congressional intent underlying the statute, improperly resulted in their overpaying royalty fees. *Cablevision Co. v. Motion Picture Ass'n of America, Inc.*, 641 F.Supp. 1154 (D.D.C.1986) (*Cablevision I*).

Cablevision effectively attacked the Copyright Office's interpretation of terms in the cable compulsory license which Congress had not defined. In particular, the cable groups argued that the Copyright Office's interpretation of "gross receipts" was unfair. Gross receipts is an important concept because "... total royalty fee[s] ... [are] computed on the basis of specified percentages of the gross receipts from subscribers to the cable service...." 17 U.S.C. § 111(d)(1)(B).[2]

In *Cablevision I*, the court agreed that the Copyright Office's interpretation of "gross receipts" was unreasonable, because, in essence, it required cable operators to pay a second time for nonbroadcast (*i.e.*, cable-originating) material that it had already paid to show, merely because the nonbroadcast material was packaged or tiered with copyrighted broadcast programs. In other words, the court held that the Copyright Office's definition of the term was too broad, and that cable operators should not have to include in their calculation of gross receipts fees generated by nonbroadcast programs.

MPAA appealed the decision to the United States Court of Appeals for the District of Columbia Circuit, which reversed the district court on the grounds that the Copyright Office's reasonable construction of the license was due judicial deference. *Cablevision Sys. Development Co. v. Motion Picture Ass'n of America, Inc.*, 836 F.2d 599 (D.C.Cir.), *cert. denied*, 487 U.S. 1235, 108 S.Ct. 2901, 101 L.Ed.2d 934 (1988) (*Cablevision II*). The court found that the Copyright Office's interpretation of gross receipts was consistent with the congressional intent underlying the passage and that it made computing royalty payments clear, whereas the district court's reading had a substantial likelihood of leading to "methodological wrangles and monitoring expenses." *Cablevision II*, 836 F.2d at 612.

In the interim between the *Cablevision I* and *Cablevision II* decisions, however, there was no satisfactory royalty payment scheme in effect. Following the district court decision, the Copyright Office issued a regulation requiring cable systems to include with their payments a report detailing what their payments would have been under the then-recently invalidated fee scheme. After the Copyright Office's interpretation of the cable compulsory license was upheld by the Court of Appeals, it collected $106.7 million in underpaid or late fees, but not interest on the payments, resulting from approximately two years of confusion in calculating royalty payments.

While the Copyright Office was taking action to collect these late fees, the MPAA requested that the Copyright Office issue a rule requiring cable operators to pay interest on the late or underpaid fees from the previous two years, as well as on any potential late or underpaid fees which would accrue in the future. In response, the Copyright Office issued a Notice of Inquiry asking, in part, whether a rule retroactively assessing interest charges on overdue royalty sums from prior and future accounting periods was legally permissible. 53 Fed.Reg. 16,567 (1988). After analyzing the responses it received to the Notice of Inquiry, the Copyright Office issued a final regulation imposing interest charges on prospective underpaid royalties only. The Copyright Office determined that the test for retroactive application of a newly-created rule set out in *Retail, Wholesale and Dep't Store Union v. NLRB*, 466 F.2d 380 (D.C.Cir.1972), was not satisfied, and it therefore declined to impose interest charges on previously underpaid royalties. 54 Fed.Reg. 14,217 (1989). The new regu-

**2.** Since that case was decided, the explanation of gross receipts has retained the same wording and meaning, but was previously found at 17 U.S.C. § 111(d)(2)(B). This court will use the most recent reference.

lation took effect in July 1989. *See* 37 C.F.R. § 201.17(i) (1989).

The MPAA disagrees with the Copyright Office's interpretation of *Retail, Wholesale* and challenges their ruling on the grounds that copyright owners will be unlawfully deprived of cable royalties, while the cable systems will be unjustly enriched. At issue for the plaintiff is approximately $15 million in interest on the underpaid fees, to which it believes it is entitled as a matter of law.

## Discussion

Both plaintiff and defendant agree that the Copyright Office has the statutory authority to impose interest charges on late royalty payments. Where plaintiff and defendant disagree are on the issues of (1) whether the decision to apply or bar retroactive application of interest charges is an adjudication or a rulemaking, and (2) whether the Copyright Office's authority mandates the retroactive application of interest charges on late royalty payments.

The statutory framework for the questions under consideration is to be found in the Copyright Act, Title 17 of the United States Code. The Copyright Office has statutory authority to issue regulations necessary to administer the Copyright Act. In general terms, "[t]he Register is authorized to establish regulations not inconsistent with law for the administration of the functions and duties made the responsibility of the Register under this title." 17 U.S.C. § 702. More specifically, the United States Code charges the Copyright Office with oversight of the cable compulsory license. Section 111(d)(1) directs that cable systems deposit their compulsory license royalty fees with the Register of Copyrights, "in accordance with requirements that the Register shall, after consultation with the Copyright Royalty Tribunal ..., prescribe by regulation." 17 U.S.C. § 111(d)(1).

The Copyright Office has authority to interpret the Copyright Act, and its interpretations of the act are due deference. *Cablevision II,* 836 F.2d at 609, citing *DeSylva v. Ballentine,* 351 U.S. 570, 76 S.Ct.

974, 100 L.Ed. 1415 (1956), *reh'g denied* 362 U.S. 907, 80 S.Ct. 608, 4 L.Ed.2d 558 (1960). Our Court of Appeals has determined that 17 U.S.C. §§ 111(d)(1) and 702 grant the Register of Copyrights the authority to issue substantive regulations interpreting the cable compulsory license which are also due deference. *Cablevision II,* 836 F.2d at 608–610.

■ Although plaintiff alleges that the challenged Copyright Office interest regulation is an adjudication and not a rulemaking, the terms of the Administrative Procedure Act (5 U.S.C. §§ 551, 553) and judicial precedent make clear that it was a rulemaking. First, the regulation was formulated in a rulemaking context because it was issued in response to MPAA's Petition for a Rulemaking filed in accordance with 5 U.S.C. § 553(e). Second, the Copyright Office followed rulemaking protocol as specified in 5 U.S.C. § 553(b)-(c), when it issued a Notice of Inquiry in the Federal Register and solicited comments from all interested parties before issuing a final regulation. Finally, the prospective interest charge governs future events and has general applicability, two of the main characteristics of a rule as defined by 5 U.S.C. § 551(4). As such, the action is a policy determination, not a determination of particular facts, issues, and liabilities, another hallmark of rulemaking.

The United States Code identifies the essential characteristic of rulemaking as futurity. A rule is defined by statute as

> ... an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy ... and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing. 5 U.S.C. § 551(4).

According to Justice Scalia, the "most authoritative interpretation of the APA, the 1947 Attorney General's Manual on the Ad-

ministrative Procedure Act (AG's Manual)," makes clear that:

> [T]he entire [APA] is based upon a dichotomy between rule making and adjudication.... Rule making is agency action which regulates the future conduct of either groups of persons or a single person; it is essentially legislative in nature, not only because it operates in the future but also because it is primarily concerned with policy considerations.... Conversely, adjudication is concerned with the determination of past and present rights and liabilities. [*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 109 S.Ct. 468, 477, 102 L.Ed.2d 493 (1988) (quoting AG's Manual at 13–14) (Scalia, J., concurring).]

Regardless of the fact that MPAA asked for a rule in the narrow context of *Cablevision* payments, the Copyright Office acted properly in considering the wider applications of its ruling. In other words, even though MPAA portrays the Copyright Office decision as an adjudication of past and present rights and liabilities between copyright owners and Cablevision, the Office took into account the fact that its action would affect the entire industry. Furthermore, as Justice Scalia makes clear in his concurring opinion in *Bowen v. Georgetown*,

> A rule with exclusively future effect (taxation of future trust income) can unquestionably *affect* past transactions (rendering the previously established trusts less desirable in the future), but it does not for that reason cease to be a rule under the APA. [*Bowen v. Georgetown*, 488 U.S. at 220, 109 S.Ct. at 477 (Scalia, J., concurring).]

Consequently, even though MPAA is correct in pointing out that the decision not to assess interest payments retroactively affects the rights of copyright owners to recoup the interest which they believe they are due from the period before the Court of Appeals upheld the Copyright Office's interpretation of the cable license, the Copyright Office's decision was still rulemaking.

Despite the heavy reliance placed by both sides on the five-prong test of *Retail, Wholesale*, that case is not applicable to the facts under consideration here. Our Court of Appeals has repeatedly made a distinction between retroactive application of adjudicatory decisions and retroactive application of regulations in applying the *Retail, Wholesale* test.

In *Retail, Wholesale*, the court was considering the National Labor Relations Board's "... retroactive application of a change in policy effectuated by it through adjudication...." *Retail, Wholesale*, 466 F.2d at 382. More recently, while evaluating the retroactive application of a rule by the Secretary of Health and Human Services, the court expressly rejected *Retail, Wholesale* (*Retail Union*) as a standard of review, in favor of the APA. "The principles enunciated in *Retail Union* govern only those situations where a new policy is announced in the course of an administrative adjudication and applied retroactively to the participants in that adjudication." *Georgetown Univ. Hosp. v. Bowen*, 821 F.2d 750, 753 (D.C.Cir.1987), *aff'd*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988).[3] Thus, the *Retail, Wholesale* test is not applicable when, as in this case, the agency's actions constitute rulemaking.

In the present case, the Copyright Office decided to impose the interest regulation only in the future. Thus, neither a test for retroactive rulemaking or adjudication is *per se* applicable since the court is not reviewing a retroactive rulemaking, but rather an agency's decision to make a rule prospectively.

The proper standard of review in the current case is deference if reasonable. In *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694, *reh'g denied*, 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984), the Court established that judicial

---

**3.** See also *Clark–Cowlitz Joint Operating Agency v. FERC.*, 826 F.2d 1074, 1081 (D.C.Cir.1987); *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 and n. 35 (D.C.Cir.1986); and *Local 900, Internat'l Union of Elec., Radio and Mach. Workers v. NLRB*, 727 F.2d 1184, 1194–95 (D.C. Cir.1984).

review of an agency action taken with an express grant of authority from Congress is held to an "arbitrary and capricious" standard. By contrast, action taken without that express delegation is held to a "deference if reasonable" standard.

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency. [*Chevron*, 467 U.S. at 843–844, 104 S.Ct. at 2782.]

By analogy, it is clear that as for an interest regulation concerning late royalty payments on secondary transmission of copyrighted television broadcasts, "the statute is silent ... with respect to the specific issue, [and] the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782.[4] Consequently, the same analysis the court used in *Cablevision II*, to determine that where the underlying intent of the cable license is unclear or unspecified, the Copyright Office has authority to interpret the statute and courts must uphold this interpretation if it is reasonable, is appropriate here. "[W]e are faced with several interpretations of ambiguous language which really involve competing policies among which Congress did not explicitly choose. We see no reason to deny the Copyright Office's legitimacy in selecting, ... among those choices so long as the interpretation selected is reasonable." *Cablevision*, 836 F.2d at 609. Thus, although there is no language in the Copyright Act concerning interest on unpaid royalties, the dispute originated in the Register's interpretation of the cable license, and the Copyright Office is the agency with the requisite expertise and authority to issue a rule such as the interest regulation. This court may only overturn the Copyright Office's regulation if it finds that it is unreasonable.

Review of agency action under the "deference if reasonable" standard is well defined. In order to sustain such an agency action, the court "need not find that it is the only permissible construction ... but only that ... [it] is a sufficiently rational one to preclude a court from substituting its judgment for that of [the agency]." *Chemical Mfrs. Ass'n v. Natural Resources Defense Council*, 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985). *See also Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782. But "... an agency or commission must articulate with clarity and precision its findings and the reasons for its decisions." *Wait Radio v. FCC*, 418 F.2d 1153, 1156 (D.C.Cir.1969), *cert. denied*, 409 U.S. 1027, 93 S.Ct. 461, 34 L.Ed.2d 321 (1972).[5]

In refusing to apply the interest charge regulation retroactively, the Copyright Office acted in accord with a line of Supreme Court decisions encouraging prospective rulemaking as the method for clarifying murky statutes or issuing needed regulations:

> There has been increasing expression of regret over the Board's failure to react more positively to the Supreme Court's rather pointed hint, *SEC v. Chenery Corp.*, 332 U.S. 194, 202 [67 S.Ct. 1575, 1580, 91 L.Ed. 1995] (1947), that since an administrative agency has "the ability to

---

4. "The Chevron *decision* ... fully conforms to the longterm law that when an agency, exercising delegated power to make law, issues a legislative rule, the reviewing court is limited to a reasonableness test." K.C. DAVIS, ADMINISTRATIVE LAW OF THE EIGHTIES, 1989 SUPPLEMENT TO ADMINISTRATIVE LAW TREATISE § 29:16 (1989).

5. Considered also in the context of retroactive application of a regulation, "... a departure from prior policy cannot stand when the agency fails to explain the reason for the change." *New England Tel. & Tel. Co. v. FCC*, 826 F.2d 1101, 1110 (D.C.Cir.1987) (citations omitted), *cert. denied sub nom. Southern Bell Tel. & Tel. Co. v. FCC*, 490 U.S. 1039, 109 S.Ct. 1942, 104 L.Ed.2d 413 (1989).

make new law prospectively through the exercise of its rule-making powers, it has less reason [than a court] to rely upon *ad hoc* adjudication to formulate new standards of conduct," and that the "function of filling in the interstices" of regulatory statutes "should be performed as much as possible, through this quasi-legislative promulgation of rules to be applied in the future." [*NLRB v. Majestic Weaving Co.*, 355 F.2d 854, 860 (2d Cir.1966) (citations omitted).]

In a more recent and more "pointed" opinion, the Supreme Court explicitly stated that retroactive rulemaking is a disfavored legal concept which must meet stringent guidelines to be upheld:

> Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result. (Citations omitted.) By the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms. (Citations omitted.) ... Even where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant. [*Bowen v. Georgetown*, 109 S.Ct. at 471.]

The statutory provisions establishing the Copyright Office's authority to promulgate regulations contain no such "express statutory grant," as specified by the Court in *Bowen v. Georgetown*, authorizing retroactive rulemaking. Consequently, §§ 111(d) and 702 cannot be read to "encompass the power to promulgate retroactive rules."[6]

In *Bowen v. Georgetown*, the Court of Appeals held that only the APA and the agency's organic statute are to be considered in reviewing the retroactive application of legislative rulemaking. The court further held that a legislative rule adopted pursuant to the notice and comment procedure of the APA, "requires that legislative rules be given future effect only." 821 F.2d at 757. Equitable considerations are "irrelevant to the determination of whether the ... rule may be applied retroactively [because] such retroactive application is foreclosed by the express terms of the APA." *Id.* Although the Supreme Court affirmed their decision, they only went so far as to hold that generally the agency's organic statute must contain an express statutory grant of retroactive rulemaking authority, not that retroactive rulemaking is *per se* invalid· in such a case. Nevertheless, the Copyright Office's regulation would satisfy the Court of Appeals' concern with following APA guidelines. Because the Copyright Act does not grant retroactive rulemaking powers concerning the cable compulsory license and because the interest regulation was issued as a rulemaking pursuant to statutory requirements, the Copyright Office's prospective application of the interest regulation was necessary and reasonable.

■ In the present case, the Copyright Office fulfilled its obligation of explaining the facts and policy concerns on which it relied in order to reach its interest regulation decision. *See* 54 Fed.Reg. 14,217 (1989). First, the Copyright Office observed that since it had never before assessed interest on late royalty payments, cable companies could reasonably be expected to have detrimentally relied on this position, to the extent that a retroactive change in policy could lead to the forfeiture of certain rights.[7] Second, cable systems,

---

6. Thus, even if the Copyright Office had attempted to impose the interest regulation retroactively, this court could not, in all probability, uphold such a decision.

7. An administrative agency might not be able to issue a rule retroactively when to do so would lead an individual or group who had relied on the government's previous position to forfeit "legal right[s]" or unduly suffer "any adverse

change in its status." *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 61–62, 104 S.Ct. 2218, 2224–25, 81 L.Ed.2d 42 (1984). Likewise, "... under certain circumstances an agency may be prevented from applying a new policy retroactively to parties who detrimentally relied on the previous policy." *New England Tel. & Tel. Co.*, 826 F.2d at 1110.

in adjusting their payments, relied on the law as espoused in the district court's decision in *Cablevision I,* which invalidated the Office's interpretation of § 111(d). It would have been unduly punitive for the Copyright Office to have required interest payments retroactively when the cable groups were not guilty of any wrongdoing. Third, prospective application would serve as notice to cable systems to structure their behavior accordingly in the future, eliminating the inequity of allowing a possible unreasonable readjustment of past relationships and responsibilities. Finally, as the Office made clear, its decision would not prevent the copyright owners from taking cable operators to court in an effort to obtain a judicial ruling that the cable systems must pay interest charges on the late payments.[8]

It is important to bear in mind that MPAA is attacking the Copyright Office for not having issued a retroactive regulation. In the final analysis, MPAA has taken an untenable position. Rulemaking, except for rare cases, is of prospective effect only; retroactivity is a disfavored legal principle, and the Copyright Act does not grant retroactive rulemaking authority. Finally, it is not clear whether the Copyright Office even has the authority to take the adjudicatory position alleged by MPAA. Nowhere in the Copyright Act is the Copyright Office given the authority to adjudicate copyright infringement actions. Sections 501 through 510 prescribe the courts as the aggrieved copyright owner's sole remedial avenue.

For the foregoing reasons, the Copyright Office's regulation imposing interest requirements on late royalty payments pursuant to the cable compulsory license is upheld.

---

8. "... the Office agrees that copyright owners should receive interest on any monies due under the cable compulsory license when they litigate and prevail against noncomplying cable systems." 54 Fed.Reg. at 14,220.